**FRANKLIN FEDERAL SAVINGS BANK, Franklin Financial Group, Inc., George O. Haggard, Jr., Ben B. Jarnagin, Richard C. Jessee, A. Eugene Jolley, Jean S. Keener, George R. McGuffin, and Charles G. Robinette, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–739 C.

United States Court of Federal Claims.

Jan. 7, 2003.

Thomas R. Dyer, Memphis, Tennessee, attorney of record for plaintiffs Franklin Federal Savings Bank and Franklin Financial Group, Inc.

Thomas M. Buchanan, Washington, D.C., attorney of record for the individual plaintiffs.

Glenn I. Chernigoff, Trial Attorney, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant.

## OPINION

LYDON, Senior Judge.

On September 5, 2002, the court issued a liability opinion in this *Winstar*-related case, holding that the United States, through the

enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), P.L. No. 101–73, 103 Stat. 183, breached an express contract with the plaintiffs (collectively the "Franklin Plaintiffs") to treat the supervisory goodwill of Franklin Federal Savings Bank—a Tennessee thrift created in January 1989 by the supervisory conversion of Morristown Savings and Loan Association and its acquisition by Franklin Financial Group, Inc., a thrift holding company—as a regulatory capital asset amortizable over 25 years. See *Franklin Federal Savings Bank, et al. v. United States,* 53 Fed.Cl. 690, 692–93 (2002). The court granted the plaintiffs' omnibus motion for summary judgment on the issue of liability. *Id.* The court also held that all of the plaintiffs—including the thrift ("Franklin Federal"), the thrift holding company ("Franklin Financial"), and the holding company's seven original shareholders ("Seven Shareholders")—were in privity of contract with the United States and therefore have standing in this action. *Id.* at 716–19. The case is now before the court on the issue of damages.

The factual background of this case is set forth in the court's liability opinion, 53 Fed. Cl. at 693–705, and will not be recapitulated here. Both sides have filed motions for summary judgment on damages, supported by reports of their respective experts, though plaintiffs also request a trial for certain claims in this action. Oral argument was held on October 23, 2002. The court finds that some of the claims involved in this action are amenable to disposition by summary judgment, while others are not. Accordingly, the parties' respective motions for summary judgment are granted in part and denied in part.

### Elements of Plaintiffs' Damages Claims

The plaintiffs have moved for *summary judgment* on a variety of overlapping restitution and reliance claims which they assert "would yield a damages award within the range of $2.5 million to $9.4 million." Pl. Supp. Br. at 1. Notwithstanding this declared dollar range for their overall claim, the plaintiffs present a series of alternative and cumulative damages theories which add up to well

over $9.4 million. As described by the plaintiffs in their omnibus motion for summary judgment, the claims on which they seek summary judgment include the following.

I. *"Pre-breach reliance damages" (or restitution) consisting of:*

a *$9.4 million* claim by the holding company, *Franklin Financial,* for the value of the excess liabilities it acquired at the time of the supervisory conversion and acquisition of the thrift, Franklin Federal, in January 1989, because the thrift was assertedly rendered "worthless" by the enactment of FIRREA in August 1989;

a *$5 million* claim by *Franklin Financial* for the cash it infused into Franklin Federal as part of the goodwill contract—characterized as "the cost of plaintiff's performance"—of which $500,000 was cash from the holding company's Seven Shareholders and $4.5 million were the proceeds of a loan from First Tennessee Bank;

a *$5 million* claim by the *Seven Shareholders* (as an alternative to the $5 million claim by Franklin Financial) for the cash they either directly infused into the holding company and the thrift ($500,000) or personally guaranteed (the $4.5 million loan to Franklin Financial from First Tennessee Bank). The claim is characterized as "a return of their (shareholders') investment" because FIRREA allegedly rendered the thrift worthless.

II. *"Post-breach wounded bank damages" consisting of:*

$334,804.60 for *district court litigation and related costs*—of which $320,734.03 is claimed by *Franklin Federal* and $14,070.57 by *Franklin Financial*—incurred in the years 1989–92 to prevent the Government from further breaching the goodwill contract by seizing the thrift or taking other adverse action pursuant to FIRREA. These costs are characterized as an effort to "mitigate damages" caused by FIRREA. The "related costs" were primarily legal fees for the preparation of new capital plans for submission to the Office of Thrift Supervision (OTS) so that Franklin Federal could meet its minimum capital requirements without the inclusion of disallowed goodwill.

$350,468.69 for *transactional costs* incurred by *Franklin Financial* and *Franklin Federal* in raising capital for infusion into the thrift in 1993.

$1,073,000.00 for the *increased cost of funds,* including the increased rates *Franklin Federal* had to pay depositors and the decreased rates it had to charge borrowers as a result of the negative publicity caused by the loss of supervisory goodwill under FIRREA. (Franklin Federal asserts that this item of its claim presents an issue of fact and requests that the court hold a "short hearing" on the issue.)

III. *The Seven Shareholders claim damages of $5.9 million for the dilution of their ownership interests in Franklin Financial and Franklin Federal.*

Because of FIRREA, the shareholders claim, they were forced to raise capital from outside sources in 1993, thus reducing their respective ownership percentages in the holding company (and the thrift). At the time of the merger with UPC in 1996, therefore, the Seven Shareholders received far less UPC common stock in exchange for their fractional interests in Franklin Financial than they would have received had they still owned 100 % of the holding company stock.

IV. *Plaintiff Charles G. Robinette, President and CEO of Franklin Federal, claims $366,452.00 for the lost opportunity to exercise stock options in Franklin Financial.*

Under his 1988 employment contract, Mr. Robinette had a three-year option to purchase up to 4 % of Franklin Financial's common stock at the initial supervisory conversion offering price. Because FIRREA rendered the thrift insolvent, plaintiff argues, the option to purchase additional stock in the holding company became worthless.

In addition to the foregoing claims on which they seek summary judgment, the plaintiffs request a *trial* on two other claims: (a) Franklin Federal's lost profits in the amount of $2.1 million and (b) the cost of replacing the thrift's disallowed supervisory goodwill—either fully (at a cost of $14.4 mil-lion to $21.2 million) or partially (at a cost of $12.7 million)—with real capital.

Defendant argues that the plaintiffs did not incur any damages as a result of the Government's breach of contract. Defendant has moved for summary judgment on all of the plaintiffs' claims.

For the reasons discussed hereinafter, the court grants *summary judgment* for plaintiff, *Franklin Federal,* on part of its post-breach "wounded bank" claim in the amount of $109,016.83. This sum represents the aggregate expenditures the thrift made between 1989 and 1992 to the law firms of Muldoon, Murphy & Faucette and Miller, Hamilton, Snider & Odom, as well as to the financial consulting firm, Hiram H. Jones Associates, P.C., for capital plan preparations and regulatory advice necessitated by FIRREA. The court also grants *summary judgment* for plaintiff, *Franklin Financial,* on part of its post-breach "wounded bank" claim in the amount of $205,841.79. This sum represents the aggregate payments the thrift made to Investment Bank Services, Inc., the law firm of Bass, Berry & Sims, and the Office of Thrift Supervision ("OTS") in connection with the public stock offering to raise new capital for Franklin Federal in 1993.

The court grants *summary judgment for defendant* on (1) the restitution claim of Franklin Financial for the $9.4 million of excess liabilities it assumed in the supervisory conversion, (2) the reliance (or restitution) claims of Franklin Financial or, alternatively, the Seven Shareholders for the $5 million infused into Franklin Federal in 1989, (3) part of the post-breach "wounded bank" claim based on the litigation expenses of Franklin Federal and Franklin Financial that were paid to the law firms of Bishop, Cook, Purcell & Reynolds, Winston & Strawn, and Muldoon, Murphy & Faucette, in connection with the district court litigation against the United States, and (4) the claim of Franklin Federal—in the alternative amounts of $21.2 million, $14.4 million, or $12.7 million—based on the cost of replacing, or partially replacing, its supervisory goodwill with real capital.

The court finds that there are disputed issues of material fact, *precluding summary*

*judgment* for either side, with respect to (1) the alternative reliance damages claim of Franklin Financial based on the excess liabilities it assumed in the supervisory conversion, (2) the additional transactional costs allegedly incurred by Franklin Financial—in the aggregate amount of $145,000–$150,000—in raising new capital for the thrift in 1993, (3) Franklin Federal's claim for the increased cost of funds due to FIRREA, (4) the dilution damages claim of the Seven Shareholders, (5) the stock option claim of Charles G. Robinette, and (6) Franklin Federal's claim for lost profits.

## DISCUSSION

Summary judgment is appropriate when there are no genuine disputes as to any material fact, and the moving party is entitled to judgment as a matter of law. See RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where a motion for summary judgment is supported in accordance with Rule 56, the non-movant must proffer countering evidence sufficient to create a genuine dispute of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When deciding a motion for summary judgment, the judge must determine whether the evidence presents a disagreement sufficient to require a submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson, supra*, 477 U.S. at 250–52, 106 S.Ct. 2505; see also *Dart Advantage Warehousing, Inc. v. United States*, 52 Fed. Cl. 694, 697 (2002). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

■ As outlined by the Federal Circuit in another *Winstar*-related case, *Glendale Federal Savings Bank, FSB v. United States ("Glendale")*, 239 F.3d 1374 (Fed.Cir.2001), the consequences the law imposes for breach of contract are for the purpose of making the non-breaching party whole. See 239 F.3d at 1379–80. There are a number of approaches the court can follow, depending upon the circumstances, in determining the appropriate damages remedy. One approach is to give the non-breaching party the benefits he or she expected to receive had the breach not occurred, also known as the "benefit of the bargain." See Restatement (Second) of Contracts § 344(a) (1981); E. Allan Farnsworth, Contracts § 12.1 at 840 (2d ed.1990). The benefits expected from a contract, called "expectancy damages," are typically equated with lost profits, though they can also include other damage elements. See Restatement (Second) of Contracts § 347. Expectancy damages are often difficult to prove.

■ Lacking proof of expectancy damages, an injured party can sue for restitution. See *Glendale*, 239 F.3d at 1380–81. A fundamental purpose of restitution is "to prevent unjust enrichment" of the breaching party. Restatement (Second) of Contracts § 344, cmt. a. Restitution serves to protect the plaintiff's "interest in having restored to him any benefit that he has conferred on the other party." *Id.* § 344(c). See also *LaSalle Talman Bank, FSB v. United States ("LaSalle Talman")*, 45 Fed.Cl. 64, 114–15 (1999) At the same time, a party seeking restitution must return any benefit(s) received from the other party. See Restatement (Second) of Contracts § 384, cmt. a. To obtain restitution, in other words, benefits received must be offset from benefits conferred. "The objective is to return the parties, as nearly as practicable, to the situation in which they found themselves before they made the contract." *Id.* The remedy of restitution "is typically not as good as lost profits, from the viewpoint of the non-breacher, but a lot better than nothing." *Glendale*, 239 F.3d at 1380.

■ A third category of damages for breach of contract, if neither expectancy damages nor restitution fit the facts of a case, is reliance damages. See *Glendale*, 239 F.3d at 1382–83. "The underlying principle in reliance damages is that a party who relies on another party's [contractual] promise .... is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Id.* at 1382 (citing Restatement (Second) of Contracts § 344(b)). "The reliance recovery is a reimbursement for losses

the plaintiff suffers in reliance on the defendant's contractual promise." 3 Dan B. Dobbs, Law of Remedies § 12.3(1) (2d ed.1993). Reliance damages are available for losses resulting from activities either before or after the breach, including expenditures made in preparation or in performance of the contract. See Restatement (Second) of Contracts § 349(b).

With this survey of remedies as our guide, the court will now consider the various damages claims advanced by the plaintiffs. To buttress their claims, the plaintiffs rely on the expert reports of two economists: (1) R. Dan Brumbaugh, a Ph.D. from George Washington University and currently a Senior Finance Fellow at the Milken Institute, and (2) Rene M. Stulz, a Ph.D. from MIT and currently departmental Chair of Money and Banking at Ohio State University. Defendant likewise offers expert reports from two economists: (1) Vincent A. Warther, a Ph.D. from the University of Chicago and currently an economic consultant at Lexecon, Inc., and (2) Sam Peltzman, a Ph.D. from the University of Chicago and currently a professor in the Graduate School of Business at the University of Chicago.

## I. *Pre-Breach Reliance Damages, or Restitution*

### A.

■ Plaintiffs claim that Franklin Financial is entitled to the $9.4 million by which the liabilities of the prior thrift, Morristown Savings and Loan Association ("Morristown"), exceeded its assets on January 12, 1989—the date of its acquisition by Franklin Financial and supervisory conversion to Franklin Federal. As explained by the Federal Circuit in *Winstar Corp., et al. v. United States ("Winstar II")*, 64 F.3d 1531 (Fed.Cir. 1995), "[i]n the context of a supervisory merger, the difference between the fair market value of the failing thrift's liabilities assumed by an acquirer and the fair market value of the failing thrift's assets was considered 'supervisory goodwill.'" 64 F.3d at 1536. Thus, the plaintiffs' $9.4 million claim is the asserted dollar amount of Franklin Federal's excess liabilities *on the date of the supervisory conversion (i.e., its initial supervisory goodwill)*.[1]

In *Glendale, supra*, the Federal Circuit considered a similar claim for the assumption of excess liabilities. Like Franklin Federal, Glendale Federal Bank survived FIRREA. Though it was out of compliance for awhile with the new capital requirements imposed by the Act, Glendale avoided failure and liquidation by raising new capital that brought it into regulatory compliance. The Court of Federal Claims held that Glendale was "entitled to restitution damages for the benefit conferred on defendant when the contract was entered in 1981, in the amount by which Broward's [the acquired thrift's] assets exceeded its liabilities on the date of the merger, less the value of the benefits Glendale received from the contract." *Glendale Federal Bank, FSB v. United States*, 43 Fed.Cl. 390, 405 (1999). The Federal Circuit disagreed, and vacated this court's restitution award. As explained by the Federal Circuit:

> [I]t is clear that the Government's promise that was breached had substantial value. . . . . [G]iven the choice between purchasing a failing thrift without the Government's promise regarding supervisory goodwill and purchasing one with it, a reasonable banker would surely take the latter. . . . .
>
> At the same time, the action taken by the purchasing S & L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift. For one, it is not at all clear that but for

---

1. *It is important to note that, although the amount of Franklin Federal's initial supervisory goodwill was measured by the net liabilities it assumed in the supervisory conversion, the two figures were never the same again. Franklin Federal's supervisory goodwill, which the thrift was allowed to count as a regulatory capital asset, began a slow descent at the annual rate of 4 % ($376,000), in accordance with the goodwill contract's 25-year amortization schedule. (See* Apx. to Pl. Opp. to Def. MSJ, Exh. 46, Table 1.) The amount of Franklin Federal's excess liabilities (*i.e.*, its negative tangible net worth), on the other hand, was immediately reduced by $5 million when the Seven Shareholders, via Franklin Financial, infused that sum into the thrift. At the time FIRREA was enacted in August 1989, Franklin Federal's excess liabilities had been further reduced to $3.5 million (see Pl. Omn. MSJ at 46).

Glendale's purchase of Broward the government would have been called upon to make up that deficit then and there. Glendale was only one of a number of potential acquirers of Broward..... [R]ather than approve a merger, the Government had .... the option of hiring new and better management to run Broward .... [W]hat the Government received in exchange for its promise was time—time to deal with other failing S & Ls, time to see what the market would do before having to commit substantial resources to the problem. Though the value of time was more than zero, there is no proof of what in fact it was worth.

It is important to remember that, even after Glendale's merger with Broward, the Government was not free of potential liability for the failing thrift. *Had interest rates not come down, and Broward, and perhaps Glendale as well, failed,* the Government's contingent liability would have matured, and *the FSLIC would have had to step in* at that time and assume the very losses that Glendale now claims were benefits the Government received.

*Fortunately for both the industry and the Government, .... interest rates did come down,* market forces allowed the thrift industry to escape impending doom, *and neither Glendale nor the Government was called upon to pay the potential losses* ....

This case, then, presents an illustration of the problem in granting restitution .... [to] the non-breaching party .... [based on] the supposed gains received by the breaching party, when those gains are both speculative and indeterminate. We do not see how the restitution award granted by the trial court, measured in terms of *a liability that never came to pass,* and based on a *speculative assessment of what might have been,* can be upheld; accordingly we vacate the trial court's damage award on this theory.

*Glendale,* 239 F.3d at 1381–82 (emphasis added). The Federal Circuit went on to state that "[i]n a case like the one before us .... we conclude that, for purposes of measuring the losses sustained by Glendale .... *reliance damages* provide a *firmer and more rational basis* than the alternative theories argued by the parties.... Reliance damages will permit a *more finely tuned calculation of the actual losses* sustained by plaintiff as a result of the Government's breach." *Id.* at 1383 (emphasis added).

Not long after its *Glendale* decision the Federal Circuit, in *California Federal Bank, FSB v. United States ("Cal Fed"),* 245 F.3d 1342 (Fed.Cir.2001), again rejected a restitution claim based on the assumption of liabilities by a surviving thrift. Cal Fed, which acquired several ailing thrifts pursuant to supervisory mergers in 1982, had argued that it was "entitled to restitution equal to the benefit conferred upon the government," 245 F.3d at 1351, which it calculated as the net liabilities it assumed in taking over the ailing thrifts (*i.e.,* the aggregate amount of their initial supervisory goodwill), offset by the earnings derived from the transactions. Defendant argued that Cal Fed did not confer the alleged benefit on the Government because "under no scenario at the date of the acquisitions would Cal Fed have ever paid the net liabilities..... [E]ither interest rates would have fallen, erasing the net liabilities (as they did), or, if interest rates remained high, Cal Fed would have failed and the FSLIC would have been forced to make good on its contingent commitments to insure the affected depositors." *Id.* The Court of Federal Claims had (unlike in *Glendale*) "denied restitutionary relief," the Federal Circuit noted, "because Cal Fed had not been harmed by its assumption of the assets and liabilities of the failing thrifts it acquired." *Id.*[2] After quoting extensively from its *Glendale* decision, the Federal Circuit concluded that "[t]here is no meaningful difference between the restitution claims in this case and *Glendale*" and upheld the trial court's denial of the claim. *Cal Fed,* 245 F.3d at 1352.

Defendant argues that the Federal Circuit's decisions in *Glendale* and *Cal Fed* pre-

---

**2.** The Court of Federal Claims specifically found that "the fall in interest rates more than covered any costs plaintiff incurred in assuming the liabilities of the failing thrifts." *California Federal Bank, FSB v. United States,* 43 Fed.Cl. 445, 455 (1999).

clude, as a matter of law, the plaintiffs' claim for the excess liabilities of Morristown that were assumed by Franklin Financial. The Federal Circuit's message in *Glendale* and *Cal Fed*, according to defendant, is that "where the thrift survived FIRREA .... an award of excess liabilities was not proper." Def. Reply at 21.

Perhaps because of the *Glendale* and *Cal Fed* decisions, the plaintiffs in the instant case framed their $9.4 million claim for the excess of Morristown's liabilities over its assets on the date of the thrift's supervisory conversion to Franklin Federal—*i.e.*, the initial value of the supervisory goodwill—as "pre-breach reliance damages" rather than a claim for "restitution." (Pl. Omn. MSJ, August 2, 2001, at 44.) In their opposition brief, however, plaintiffs called the $9.4 million claim a "restitution" claim. (Pl. Opp. to Def. MSJ, September 18, 2001, at 41–46.) In their reply and supplemental briefs the plaintiffs argued that the $9.4 million claim for the excess liabilities of Morristown assumed by Franklin Financial is compensable under *either* a reliance *or* a restitution theory. (Pl. Reply Memorandum in Support of Omn. MSJ, October 10, 2001, at 17–19; Pl. Supp. Memorandum in Support of MSJ on Damages, October 11, 2002, at 2.)

With respect to their reliance theory, plaintiffs assert that Franklin Financial's willingness to assume the excess liabilities—in reliance on the Government's promises in the goodwill contract—was premised on the expectation that Franklin Federal could leverage the supervisory goodwill and thereby create a positive income stream that would more than pay for the cost of the liabilities. Because of FIRREA, however, which effectively eliminated Franklin Federal's right to treat supervisory goodwill as regulatory capital, Franklin Financial did not get the opportunity to leverage the thrift's goodwill. Instead, plaintiffs allege that Franklin Financial, through Franklin Federal, was forced to pay off the entirety of the excess liabilities so that it could regain regulatory capital solvency. According to plaintiffs, "the $9.4 million used to pay off the liabilities would otherwise have gone into retained earnings, and through dividends, could

have been passed onto Franklin Financial and the Seven Shareholders." Pl. Omn. MSJ at 45–46. Thus, "these liabilities constituted real costs and required real expenditures," plaintiffs contend. *Id.* at 45. Because Franklin Financial assumed the cost of Morristown's excess liabilities ($9.4 million) in reliance upon the Government's promise of favorable regulatory treatment, and was required to pay off the entire amount after the Government broke that promise, plaintiffs conclude that the holding company is entitled to reliance damages of $9.4 million—the full amount of the inherited liabilities. In response to the Government's assertion that *Glendale* and *Cal Fed* preclude an award of this nature, plaintiffs contend that the Federal Circuit in those cases never addressed the recoverability of excess liabilities as "costs" under a reliance theory. Rather, the Federal Circuit only held that the Government was not obliged to disgorge the alleged contractual benefits under a restitution theory.

As for their restitution theory, plaintiffs argue that the court cannot rule against them on summary judgment because the Federal Circuit has not rejected, as a matter of law, granting restitution to an acquiring thrift for the excess liabilities it assumes from an ailing thrift in a supervisory conversion. If the court does not grant summary judgment on their $9.4 million "excess liabilities" claim, plaintiffs assert, it should grant them a trial on the factual issue of whether the Government would have been forced to liquidate Morristown but for the goodwill contract, and thereby assume responsibility for paying off the thrift's $9.4 million of net liabilities. In *Glendale*, plaintiffs point out, the Court of Federal Claims conducted a lengthy trial which produced a voluminous record. The Federal Circuit rejected Glendale's restitution claim for the net liabilities it assumed, and vacated the trial court's award therefor, only after reviewing that trial record and concluding that in "this case" restitution was inappropriate because it was "measured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been." *Glendale*, 239 F.3d at 1382. (The same reasoning was applied by the Federal Circuit in upholding the Court of Federal Claims denial, after

trial, of a similar restitution claim in *Cal Fed.*) Accordingly, plaintiffs assert that they are at least entitled to a trial on their $9.4 million restitution claim for the excess liabilities that Franklin Financial assumed in 1989.

In further support of their restitution claim, plaintiffs cite the Federal Circuit's ruling in *Landmark Land Company, Inc. v. FDIC ("Landmark")*, 256 F.3d 1365 (Fed. Cir.2001), for the proposition that "if the Franklin Plaintiffs can establish a reasonable probability that their acquisition of Morristown permitted the government to avoid liquidating the thrift, and the concomitant payment to Morristown's insured depositors, the government would then be required to disgorge this benefit in the form of restitution damages." Pl. Opp. at 42. *Landmark*, however, is factually and legally distinguishable from the case at bar. The restitution award upheld by the Federal Circuit in *Landmark* was based on the cash contribution of Landmark (a real estate development company) to the acquired thrift (Dixie) under a 1982 Assistance Agreement, not the value of the thrift's excess liabilities at that time (*i.e.*, the presumed cost to the Government of liquidation). The supervisory goodwill the thrift was allowed to book under the Assistance Agreement (which equaled its excess liabilities or cost of liquidation) was five times higher than the plaintiff's cash contribution. Dixie was rendered insolvent by FIRREA in 1989, after which it was seized by federal regulators and placed into receivership in 1991. So Landmark lost its investment in the thrift, unlike the holding company and shareholder plaintiffs in this action. The restitution award in *Landmark*, therefore, was based not on the value of the excess liabilities assumed under the goodwill contract, but on Landmark's tangible cash con-

tribution to the failed thrift.[3] Accordingly, *Landmark* does not support the restitution theory presented by the plaintiffs for their excess liabilities claim.

The Court of Federal Claims has not reached a consensus as to whether the Federal Circuit's ruling in *Glendale* (and *Cal Fed*) was intended to bar, as a matter of law, awards in *Winstar*-related cases for the excess liabilities assumed under a goodwill contract. In *Westfed Holdings, Inc., et al. v. United States ("Westfed")*, 52 Fed.Cl. 135, 164 (2002), for example, the court held that plaintiff's restitution claim for benefits allegedly conferred on the United States under the goodwill contract (*i.e.*, the liquidation costs the FSLIC purportedly saved when Westfed acquired two ailing thrifts) was *not* legally barred by *Glendale*. In denying defendant's motion for summary judgment and permitting the matter to go to trial, however, the court cautioned that "restitution measured by benefits conferred appears to be disfavored as a remedy [by the Federal Circuit]. Plaintiff bears the burden of demonstrating that damages so measured are more than speculative." *Id.* Westfed did not assert a claim under the alternative theory of reliance damages (*i.e.*, as the cost(s) of assuming the ailing thrifts' excess liabilities in reliance on the Government's contractual promise). So this potential remedy was not addressed by the court.

In *Suess, et al. v. United States ("Suess")*, 52 Fed.Cl. 221 (2002), the court's interpretation of *Glendale* is a little murkier. After stating that *Glendale* "bars the court from using the market value of the assumed liabilities as the baseline for determining restitution," the court went on to say that "[t]here is no record evidence in this case to indicate

---

3. The Court of Federal Claims, in the underlying trial court decision, denied the FDIC's claim, as successor to the failed thrift (Dixie), for the value of the thrift's supervisory goodwill that was eliminated by FIRREA, citing failure of proof. See *Landmark Land Company, Inc. & FDIC v. United States*, 46 Fed.Cl. 261, 273–74 (2000). The Federal Circuit gave only passing attention to that ruling on appeal, and made no substantive judgment thereon, because it determined that the FDIC lacked standing and dismissed its claims. 256 F.3d at 1379–80. The trial court also granted the FDIC restitution for Dixie's initial cash

infusion into another thrift (St. Bernard) which it took over in 1986, the amount of which exactly covered the acquired thrift's deficit net worth or excess liabilities on the date of acquisition. Noting that "[i]t would have cost the Government $17.7 million to liquidate St. Bernard in 1986, when Dixie took it over," the court stated that "[t]he benefit to the Government was $17.7 million," and granted the FDIC a restitution award in that amount. 46 Fed.Cl. at 272–73. The award was vacated by the Federal Circuit when it determined that the FDIC had no standing in the case.

that supposed gains [*i.e.*, benefits received by the Government] were less 'speculative and indeterminate' than they were in *Glendale,* and the logic underpinning both the claim in *Glendale* and the claim here is identical." 52 Fed.Cl. at 229. Since the ruling in *Suess* followed an extended trial (which preceded the Federal Circuit's ruling in *Glendale* ), the court's language regarding the *Glendale* "bar" would seem to reflect its judgment that it was the plaintiffs' inability to prove any actual damages, as in *Glendale,* which precluded a restitution award for the excess liabilities assumed from two ailing thrifts. Later in its opinion, however, the court referred to the plaintiffs' restitution model as "legally barred," 52 Fed.Cl at 230, which seems to indicate that the court viewed *Glendale* as preventing plaintiffs from recovering on their restitution claim under any factual scenario. Furthermore, the court went on to reject the alternative theory of reliance damages, stating that "the body of plaintiffs' belated reliance claim—based on plaintiffs' calculation of the value of the assumption of liabilities of [the ailing thrifts] ....—is no different than the basis of the restitution claim and is therefore equally flawed." *Id.* at 231.

In *Citizens Federal Bank FSB, et al. v. United States ("Citizens"),* 52 Fed.Cl. 561 (2002), the court's interpretation of *Glendale* was clear, and contrary to the conclusion reached in *Westfed.* The court found that *Glendale* barred plaintiff's restitution claim, as a matter of law, for the liquidation costs saved by the Government when Citizens acquired a failing thrift, and granted defendant summary judgment on the claim. (The liquidation costs in *Citizens* were calculated as the net liabilities assumed in the goodwill contract offset by the financial assistance received from the FSLIC, plus earnings on the balance.) Though plaintiff argued that it "assumed actual liabilities representing real losses incurred," 52 Fed.Cl. at 565, the court found that there was "no substantive basis upon which the present case can be distinguished from *Glendale.*" *Id.*

Restitution based on a "benefit conferred" theory requires "determining what benefit from the contract the breaching party has received, and restoring that to the non-

breaching party." *Glendale,* 239 F.3d at 1381 . . . . . [W]hile the Federal Circuit in *Glendale* found the lack of an actual net liability [falling interest rates erased the net liability assumed in the goodwill contracts] as illustrative of the speculative nature of restitution, the overall uncertainty associated with that remedy is the impossibility of ascertaining the exact benefit conferred on the Government . . . . . [T]he true benefit to the Government was time . . . .

*Citizens,* 52 Fed.Cl at 566. The court concluded that "[b]ecause the damages sought by Citizens for 'benefits conferred' are too uncertain, restitution on this basis is precluded as a matter of law." *Id.*

The court in *Citizens* also held that plaintiffs were not entitled to assert reliance damages as a theory of recovery at trial because they had not previously asserted such a claim for relief. In contrast to restitution, the court observed, which "plac[es] the non-breaching party in as good a position as he would have been in had the contract not been made," 52 Fed.Cl. at 566, reliance, as defined by the Federal Circuit in *Glendale,* "entitl[es] the party who relies on another party's promise (made binding through contract) to any losses actually sustained as a result of the breach of that promise." *Id.* The court granted summary judgment for defendant on plaintiffs' claim for reliance damages because of the "failure to previously assert a claim for such relief." *Id.* The implication of that language is that the court may have allowed a reliance damages claim to go to trial if it had been timely asserted.

Taking all of the applicable case law into account, the court finds that *Glendale* bars Franklin Financial's $9.4 million excess liabilities claim on a restitution theory. As the Federal Circuit stated in *Glendale,* the essence of restitution is restoring the parties to the *status quo ante* by "taking from the breaching party any benefits received from the contract and returning them to the non-breaching party." 239 F.3d at 1380–81. In the case at bar, the court is not persuaded that the Franklin Plaintiffs conferred a benefit of $9.4 million on the Government. Though that figure may have been the

amount of Morristown's excess liabilities when the goodwill contract was executed in January 1989, the thrift's net liabilities changed almost daily due to interest rate fluctuations and other factors. By the time FIRREA was enacted in August 1989, Franklin Federal's net liabilities (due primarily to the $5 million capital infusion of the Seven Shareholders, in exchange for stock of equivalent value) were down to $3.5 million. See Pl. Omn. MSJ at 46. Perhaps most importantly, the Government remained contingently liable for the thrift's liabilities at all times because the FSLIC (after FIRREA, the FDIC) would have had to pay off the insured depositors in the event of liquidation. In short, the "impossibility of ascertaining the exact benefit conferred on the Government" is just as problematical here as in *Citizens,* 52 Fed.Cl. at 566. Moreover, whether the FSLIC or FDIC would have been forced to liquidate Morristown but for the goodwill contract is at best a guess. The Government disfavored liquidation as a means of resolving ailing thrifts and would no doubt have explored other options for Morristown. It is inherently speculative to try to figure out now what the Government might have done, under different circumstances, nearly a decade and a half ago. Thus, the remedy of restitution is as ill-suited in this case as it was in *Glendale.*

■ As in *Glendale,* however, the court is also persuaded that the Franklin Plaintiffs are entitled to pursue their claim for the assumption of Morristown's excess liabilities on a reliance theory—*i.e.,* as costs incurred in reliance on the Government's promise in the goodwill contract. "[F]or purposes of measuring the losses sustained by Glendale as a result of the Government's breach," the Federal Circuit stated, "reliance damages provide a firmer and more rational basis than the alternative theories argued by the parties." 239 F.3d at 1383. On remand, Glendale sought to recover the value of the excess liabilities it assumed from Broward as a cost incurred in reliance on its goodwill contract with the Government. Plaintiff had presented the same reliance damages theory at trial as an alternative to its restitution theory. In its remand decision the Court of Federal Claims rejected the reliance damages claim

on the ground that plaintiff's damages model did not show any "actual losses." *Glendale v. United States,* 54 Fed.Cl. 8, 13 (2002). The court reasoned as follows:

> The Federal Circuit .... concluded, *based on the facts of the case,* that *"neither Glendale* nor the Government was called upon to pay the potential losses ...." *Glendale,* 239 F.3d at 1382 (emphasis added)..... And, as this court stated in its prior opinion on damages, a critical failing of plaintiff's model is that "it does not show that [Glendale] actually had to expend this amount in reliance on the contract." *Glendale,* 43 Fed.Cl. at 403.
>
> Plaintiff's attempts to get around this holding and the Federal Circuit's focus on "actual losses" are simply unavailing.

*Glendale,* 54 Fed.Cl. at 13. Thus, the Court of Federal Claims denial, on remand, of plaintiff's reliance damages claim for the excess liabilities it assumed under the goodwill contract was based on its own prior holding that the evidence of record, which included the testimony and exhibits of a long trial, did not establish that Glendale had incurred any "actual losses." The court's decision, in other words, was "based on the facts of the case," not on a reading of the Federal Circuit's ruling as barring the court, by law, from awarding Glendale any reliance damages based on its excess liabilities claim.

■ As explained by the Federal Circuit in *Glendale,* and previously cited in this opinion, "[t]he underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any *losses actually sustained* as a result of the breach of that promise." 239 F.3d at 1382 (emphasis added). In order to recover reliance damages, therefore, the Franklin Plaintiffs must establish that their assumption of Morristown's excess liabilities under the goodwill contract led to concrete, measurable losses when the enactment of FIRREA breached the contract. In the court's judgment, there are numerous issues of material fact in dispute which preclude the disposition of this claim by summary judgment for either side. For example, although the excess liabilities

claim is in the amount of $9.4 million, plaintiffs have not demonstrated losses remotely close to that amount. Plaintiffs admit that the thrift's net liabilities at the time of FIRREA's enactment had been reduced to around $3.5 million due to the $5 million infusion of the Seven Shareholders in January 1989 (for which they received stock of equivalent value) and earnings up to August 1989. See Pl. Omn. MSJ at 46. So the plaintiffs only had $3.5 million of excess liabilities to pay off *as a result of the breach.* The actual cost to the plaintiffs may be less than that, however, since the plaintiffs probably derived some benefit from extinguishing the liabilities (like saving interest payments).

Defendant disputes plaintiffs' assertion that they paid off any excess liabilities of Morristown, contending that "in fact, neither plaintiffs nor the [Government] were ever called upon to do so." Def. MSJ at 57. Defendant quotes liberally from *Glendale,* in which the Federal Circuit explained that the excess liabilities the thrift assumed in the goodwill contract were wiped out by falling interest rates. The goodwill contract in *Glendale,* however, was executed in 1981, so the thrift benefitted from the nearly decade-long decline of interest rates before FIRREA was enacted in 1989. (The same was true in *Cal Fed,* in which excess liabilities assumed in 1982 were eliminated by the subsequent decline in interest rates.) Thus, the factual scenarios in *Glendale* and *Cal Fed* distinguish them from the case at bar, in which the goodwill contract was executed just months before FIRREA. Franklin Federal certainly did not benefit to the same degree as Glendale and Cal Fed from falling interest rates. Nevertheless, plaintiffs must do more than merely claim that the liabilities they paid off as a result of FIRREA "required real expenditures." Pl. Omn. MSJ at 45. At trial they must demonstrate when, to whom, and in what amounts those expenditures were made, and that FIRREA was the proximate cause of the expenditures. Plaintiffs must also ensure that those cost items are not claimed elsewhere in this action. The burden of proof rests with the plaintiffs.

### B.

As an alternative to their claim for the excess liabilities of Morristown assumed by Franklin Financial, the plaintiffs argue that Franklin Financial or the Seven Shareholders should be awarded $5 million, under either a restitutionary or a reliance theory, for the cash infusion to Franklin Federal under the goodwill contract on the date of the supervisory conversion—January 12, 1989. Plaintiffs term their $5 million infusion—of which $500,000 was cash from the Seven Shareholders and the other $4.5 million was a loan from First Tennessee Bank to Franklin Financial, personally secured by the Seven Shareholders—a "cost of performance" under the contract. Moreover, there was no offsetting benefit to the plaintiffs (which would have to be deducted from the cost of performance) because the Government breached the contract just seven months later by enacting FIRREA, which radically curtailed the use of supervisory goodwill as regulatory capital and thereby rendered Franklin Federal, in plaintiffs' parlance, "worthless." [4]

Plaintiffs assert that "[a]t least four courts have now found that a return of a plaintiff's contribution into the acquired thrift is an appropriate remedy for breach of a goodwill contract," citing *Landmark, supra,* 256 F.3d 1365, 1382 (Fed.Cir.2001); *Hansen Bancorp, Inc., et al. v. United States ("Hansen"),* 53 Fed.Cl. 92, 104 (2002); *Far West Federal Bank v. OTS ("Far West"),* 119 F.3d 1358, 1367 (9th Cir.1997); and *RTC v. FSLIC ("RTC"),* 25 F.3d 1493, 1505 (10th Cir.1994). Pl. Supp. Mem. at 7. In *Landmark* and *Han-*

---

4. The evidence of record refutes plaintiffs' contention that Franklin Federal was "worthless" as a result of FIRREA. Though the institution had a negative tangible net worth in the wake of FIRREA, it still had substantial assets to leverage (approximately $100 million worth at the end of 1989). Charles Robinette, Franklin Federal's president and CEO, testified to the thrift's underlying strength in an affidavit dated June 21, 1990, in which he stated that "[s]ince the [supervisory] conversion [in January 1989], Franklin Federal has not only met, but has surpassed, the targets contained in its business plan [of May 1988] .... [N]either the Bank Board nor the Office of Thrift Supervision (OTS) has questioned the institution's current viability." Apx. to Jt. PFUF, Vol. I, at 201.

*sen,* however, the subject thrifts failed and were liquidated. In *Far West* and *RTC* the subject thrifts were likewise placed in receivership. None of the thrifts in the foregoing cases survived FIRREA, so the plaintiffs' investments were truly lost. In the case at bar, by contrast, the subject thrift was not liquidated. Franklin Federal survived, prospered, and ultimately took a different form in the UPC merger. At the time of the merger in 1996 the Seven Shareholders still held all of their original stock in Franklin Financial (the sole shareholder of Franklin Federal) which they had received in exchange for their initial capital investment in 1989. As part of the merger agreement the Seven Shareholders exchanged their Franklin Financial stock for UPC stock. Thus, neither Franklin Financial nor the Seven Shareholders lost the original $5 million investment in Franklin Federal. What the Seven Shareholders received in exchange for that investment (direct ownership of the holding company and indirect ownership of the thrift) they still have in the form of UPC stock.

Based on this fact defendant argues that the plaintiffs' claim for the return of their $5 million initial investment must be denied. "[W]hen plaintiffs invested money into Franklin Financial, which then infused that money into Franklin Federal, its wholly-owned subsidiary, plaintiffs were not damaged." Def. Opp. at 33. The Seven Shareholders received the common stock of Franklin Financial in exchange for their investment. "In economic terms," defendant explains, "common stockholders receive a right to the future cash flows of the company, either in the form of dividends or capital gains upon the sale of their stock." *Id.* at 34 (citing report of Dr. Warther, Def. Supp. Apx. at 264–82). "The only actual costs incurred by purchasers of securities are transaction costs, such as brokerage fees. Thus, when the shareholder plaintiffs infused money into their thrift, they merely moved money from their right pocket into their left pocket." *Id.* (citing *Cal Fed,* 245 F.3d at 1350).

The court agrees with defendant. Neither this court nor the Federal Circuit has ruled, in any *Winstar*-related case, that a plaintiff is entitled to a return of its capital contribution in the context of a supervisory conversion when the converted thrift survived FIRREA. In the case at bar, neither Franklin Financial nor the Seven Shareholders lost the $5 million invested in Franklin Federal at the time of the goodwill contract in 1989. The Seven Shareholders received common stock of equivalent value in the holding company, and retained that stock until the UPC merger seven years later. During that time the per share price of the stock increased from $10 to $17 (*i.e.,* by 70 %). So the initial $5 million investment paid off handsomely for Franklin Financial and the Seven Shareholders. In 1996 the Seven Shareholders received UPC stock in exchange for their original shares in Franklin Financial, which they hold to this day. Thus, the Government's breach of the goodwill contract did not result in any damages to Franklin Financial or the Seven Shareholders with respect to their initial $5 million investment in the thrift. Defendant is entitled to summary judgment on this claim.

## II. *Post–Breach Reliance ("Wounded Bank") Damages*

### A.

Plaintiffs seek "wounded bank" damages of $334,804.60 for district court litigation and related costs incurred by Franklin Federal ($320,734.03) and Franklin Financial ($14,070.57) in contesting the Government's enforcement of FIRREA against the thrift, preparing new capital plans for submission to the OTS, and obtaining post-FIRREA regulatory advice. These costs, which arose during the time period November 1989 to August 1992, are itemized in a declaration by James W. Craine, a CPA with Hiram H. Jones Associates, P.C., in Morristown, Tennessee, who performed accounting services for Franklin Federal from 1990 to 1996 (Exh. 26, Apx. to Pl. Omn. MSJ). Craine states that the costs pertain to "the lawsuit [against the OTS] which was filed on June 21, 1990 in the United States District Court for the Eastern District of Tennessee, advice on FIRREA regulatory matters and the filing of capital plans with OTS." Declaration of James W. Craine ("Craine Declaration"), July 26, 2001.

The litigation costs relate to the effort by the Franklin Plaintiffs to enjoin the OTS and the FDIC from seizing Franklin Federal or taking any other adverse regulatory action against the thrift based on the FIRREA-mandated exclusion of supervisory goodwill from Franklin Federal's regulatory capital calculations. Though ultimately unsuccessful, the litigation did succeed in staying the Government's hand for nearly a year and a half.[5] The record indicates that the litigation costs totaled $225,787.77—consisting of $186,707.89 paid by Franklin Federal to the law firms of Bishop, Cook, Purcell & Reynolds and Winston & Strawn between May 15, 1990 and April 17, 1992 (Apx. to Jt. PFUF, Vol. I, at 437); $25,009.31 paid by Franklin Federal to the law firm of Muldoon, Murphy & Faucette between September 6, 1990 and May 22, 1992 (Apx. to Jt. PFUF, Vol. II, at 489); and $14,070.57 paid by Franklin Financial to the law firm of Winston & Strawn between January 2, 1992 and August 4, 1992 (Apx. to Jt. PFUF, Vol. II, at 591). According to the plaintiffs, the litigation more than a decade ago prevented the likely seizure of Franklin Federal by the Government, which would have significantly increased the damages sought in the case at bar. Accordingly, plaintiffs allege that the costs they incurred in the district court litigation served the purpose of mitigating the damages caused by the Government's breach of their goodwill contract. The costs of mitigation, even if unsuccessful, are recoverable as damages. See Restatement (Second) of Contracts § 350 & Cmt a. (1979).

Defendant argues that plaintiffs' district court litigation costs are not compensable because attorney fees incurred in litigating against the Government are not recoverable absent an express statutory provision allowing them. See *Piggly Wiggly Corp. v. United States,* 112 Ct.Cl. 391, 432, 81 F.Supp. 819 (1949); *LaSalle Talman, supra,* 45 Fed.Cl. at 97 (1999). The plaintiffs have not pointed to any statutory provision that allows for the payment of their attorney fees in the earlier district court litigation. In defendant's view, therefore, recov-

ery of those fees is barred as a matter of law.

The court agrees with defendant. The plaintiffs cannot change the essential character of their claim, which is for litigation costs incurred in their district court action, by relabeling it as a claim for the "costs of mitigation." The law is quite clear that statutory authorization is the *sine qua non* for recovery of legal costs arising from litigation against the Government. No such statutory authorization is applicable here. The court grants summary judgment for defendant on plaintiffs' claim, totalling $225,787.77, for district court litigation costs against the Government.

As for the "related costs" claimed herein, the record establishes that Franklin Federal paid an aggregate amount of $109,016.83 to the law firms of Muldoon, Murphy & Faucette and Miller, Hamilton, Snider & Odom, as well as to the accounting firm of Hiram H. Jones Associates, P.C., for (a) the preparation of post-FIRREA capital plans filed with the OTS and (b) regulatory advice after the enactment of FIRREA. These costs include $49,952.86 paid to Miller, Hamilton, Snider & Odom in 1989 and 1990 for "representation .... in respect to regulatory matters resulting from the adoption of FIRREA" (Apx. to Jt. PFUF, Vol. II, at 592); $1,500.00 paid to Hiram H. Jones Associates, P.C., on July 11, 1991 for "capital plan consultation" (Apx. to Jt. PFUF, Vol. II, at 589); and $57,563.97 paid to Muldoon, Murphy & Faucette for "capital plan" filings ($40,756.35 from July 10, 1991 to September 18, 1992) and for "general regulatory matters" ($16,807.62 from July 10, 1991 to April 30, 1992) (Apx. to Jt. PFUF, Vol. II, at 489). The court finds that these expenditures by Franklin Federal were proximately caused by FIRREA because, as the Federal Circuit described in *Glendale,* they were "losses actually sustained as a result of the breach of [the Government's] promise" to treat supervisory goodwill as regulatory capital. 239 F.3d at 1382. To reimburse Franklin Feder-

5. An injunction issued by the district court in July 1990 was ultimately vacated in November 1991 when the Supreme Court denied the Frank-

lin Plaintiffs' petition for a writ of certiorari to hear their appeal of the 6th Circuit Court of Appeals reversal of the district court order.

al for the losses caused by its reliance on the contract, and to put the thrift in as good a position as it would have occupied if the contract had never been made, the court determines that Franklin Federal is entitled to summary judgment on part of its "wounded bank" claim, in the aggregate amount of $109,016.83, for the costs it incurred for post-FIRREA capital plan filings and regulatory advice.

### B.

 Plaintiffs seek "wounded bank" damages of $350,468.69 for transactional costs incurred by Franklin Financial in raising new capital for infusion into Franklin Federal in 1993.[6] According to the plaintiffs, these costs are recoverable because the Government's breach of contract proximately caused Franklin Financial and the Seven Shareholders to seek new capital as a means of closing their regulatory capital shortfall resulting from FIRREA. Defendant concedes that transactional costs incurred by the Franklin Plaintiffs in raising new capital may be compensable in principle (citing *Cal Fed*, 245 F.3d at 1350), but contends that the only transactional costs the plaintiffs incurred arose after Franklin Federal had reached capital compliance and was no longer subject to governmental oversight and control. In defendant's view, therefore, the costs claimed by the plaintiffs were not proximately caused by FIRREA, but rather voluntarily incurred. As such, they are not recoverable as reliance damages.

The transactional costs at issue relate to the capital infusions into Franklin Federal that followed OTS issuance of a capital directive incorporating the plaintiffs' capital plan on June 19, 1992, which aimed at bringing the thrift into regulatory capital compliance under FIRREA. The capital plan required the Seven Shareholders to make two capital infusions of $500,000 each by early 1993, followed by a public offering or private placement of additional shares of stock by Franklin Federal to raise at least $1,700,000 by June 30, 1993 and achieve a 3% tangible

capital ratio. Pursuant to the capital directive and approved capital plan, the Franklin Plaintiffs made three capital infusions into the thrift: (1) on June 26, 1992, the Seven Shareholders, through Franklin Financial, infused $500,000 of equity capital into Franklin Federal; (2) on December 15, 1992, the Seven Shareholders, through Franklin Financial, infused another $500,000 of equity capital into Franklin Federal; and (3) in March 1993 Franklin Financial completed a private placement of more than 206,000 shares of Class A common stock to eleven persons, four of whom (plaintiffs Jolley, Haggard, Jarnagin and Jessee) were existing shareholders and directors. The shares sold for a total of $1.76 million, of which $1,734,457 was infused into Franklin Federal on March 30, 1993. A few months later the thrift received a fourth capital infusion. In July and August 1993 Franklin Financial completed a public stock offering in which more than 383,000 shares of Class A common stock were sold (to the Seven Shareholders and many other investors) for around $3.1 million. $2,703,000 of that capital was infused into Franklin Federal.

The transactional costs claimed by Franklin Financial, totaling $350,468.69, are itemized in the previously discussed Craine Declaration of July 26, 2001 (Exh. 26, Apx. to Pl. Omn. MSJ). As explained by Craine, the "costs pertain[ ] to [Franklin Financial's] successful efforts to raise equity capital in 1993" and include the following expenditures:

(a) OTS costs—$4,320.00,

(b) Investment Bank Services, Inc.—$170,243.88,

(c) Bass, Berry & Sims legal fees—$31,277.81,

(d) Franklin Federal's expenses in raising capital—$134,630.00, and

(e) other expenses—$9,997.00.

Further evidence of the transactional costs, including their dates of payment, is provided in a document prepared on September 27, 1999 by the accounting firm Hiram H.

---

6. On November 13, 2002, in response to the court's request at oral argument for a joint stipulation as to the costs plaintiffs incurred raising capital in 1993, plaintiffs unilaterally filed some

additional exhibits and asserted that their transaction costs were actually $355,086.29. No joint stipulation was filed by the parties.

Jones Associates, P.C., entitled "Franklin Financial Group, Inc., Proceeds & Related Issuance Costs, 1993 Stock Offering." Apx. to Jt. PFUF, Vol. II, at 702 ("Jones compilation"). As listed therein under "stock issuance costs," the OTS costs—$4,320.00—were paid by Franklin Financial in two checks of $1,620.00, on April 27, 1993, and $2,700.00, on July 1, 1993; the Investment Bank Services, Inc. costs—$170,243.88—were paid by Franklin Financial in a check dated August 20, 1993; and the Bass, Berry & Sims legal fees—$31,277.91—were paid by Franklin Financial in a check dated September 28, 1993. The Jones compilation also lists the remaining two items in the Craine Declaration— "expenses paid by bank & reimbursed by [Franklin] Financial Group" in the amount of $134,630.00 and "other expenses" in the amount of $9,997.00—without specifying to whom these sums were owed or the date(s) they were paid, and acknowledging that underlying documentation could not be located.

In addition to the foregoing costs, the Jones compilation lists six payments to Winston & Strawn between April 21, 1993 and August 27, 1993, totaling $4,582.50. These costs were not included in plaintiffs' claim, though the amount thereof almost exactly fills the gap between the total transaction costs listed in the Craine Declaration of July 2001 and the augmented total in his supplemental declaration of November 11, 2002, *infra*.

On November 13, 2002, in response to the court's request at oral argument for a joint stipulation from the parties as to the costs the plaintiffs incurred in raising capital in 1993, plaintiff submitted, *inter alia*, a Supplemental Declaration of James W. Craine, dated November 11, 2002 ("Supp. Craine Decl."), which asserts that Franklin Financial's total expenditures in raising equity capital in 1993 were $355,086.29 (roughly $4,600 above his previous declaration). Mr. Craine states he is able, based on a review of invoices and other relevant documents (including Exhibits 2–5 of his supplemental declaration), to specifically itemize $242,914.88 of Franklin Financial's costs.[7] As listed in his earlier declaration, the expenditures include (a) OTS costs of $4,320.00; (b) Investment Bank Services of $170,243.88; and (c) Bass, Berry & Simms legal fees of $31,277.91. They also include the following additional costs of roughly $37,000: (d) Tennessee Department of Commerce—$1,000.00, paid on June 1, 1993; (e) Hiram H. Jones Associates, P.C.—$25,285.00, paid as follows: $600 on February 17, 1993, $2,050.00 on March 27, 1993, $5,120.00 on May 20, 1993, $6,785.00 on July 17, 1993, and $10,730.00 on an undocumented date in the spring of 1993; (f) Mellon Securities—$7,861.90, including $5,730.90 for "basic conversion services" and $2,131.00 for "other services," dates of payment undocumented; as well as (g) U.S. Postal Service stamp expenses—$2,569.69, dates of payment undocumented; (h) U.S. Postal Service post office box rental—$28.50, date of payment undocumented; and (i) Federal Express— $328.00, paid as incurred between June and August 1993.

Thus, plaintiffs are still unable to specifically itemize more than $100,000 of their claimed transactional costs.[8]

Defendant contends that none of the foregoing transactional costs are recoverable as reliance damages in this action because they were incurred after Franklin Federal had achieved regulatory capital compliance and the OTS had released the thrift from its capital directive. Franklin Federal was not required to raise any additional equity capital after the OTS directive was lifted in May 1993. So the enactment of FIRREA (*i.e.,*

7. Mr. Craine indicates that Franklin Federal initially paid $148,244.50 of the costs, but was subsequently reimbursed by Franklin Financial "from the offering proceeds." Suppl. Craine. Decl. ¶ 6.

8. Defendant objected to plaintiffs' failure to comply with the court's request for a joint stipulation on transactional costs. Defendant asserted that plaintiffs did not respond to its request, conveyed in a letter dated October 25, 2002, that they produce to the Government any additional documentation in support of their transactional costs prior to the filing of a joint stipulation. The court acknowledges that plaintiffs' filing did not strictly comply with the court's request, but has nevertheless allowed the documentation submitted therewith to be added to the record because it is probative with respect to the transactional costs claimed in this action.

the Government's breach of contract), defendant argues, cannot be viewed as the proximate cause of the plaintiffs' decision to go ahead with their public stock offering in July–August 1993. The parties have stipulated that Franklin Financial's payments to Investment Bank Services, Inc., Bass, Berry & Sims, and the OTS—totaling $205,841.79— were incurred in connection with the public stock offering. See Jt. PFUF at 26 (¶ 107). As for the remaining $145,000–$150,000 of transactional costs claimed by plaintiffs, it is unclear from the spotty documentation of record whether those costs pertain to the private placement in March 1993—i.e., before Franklin Federal had achieved regulatory capital compliance—or to the public offering in the summer of 1993.

Plaintiffs assert that all of the transactional costs are recoverable, whether incurred before or after Franklin Federal's release from the OTS capital directive, because they were all proximately caused by FIRREA's elimination of supervisory goodwill which impelled Franklin Financial and the Seven Shareholders to raise new capital. That Franklin Federal reached capital compliance prior to the public stock offering is irrelevant, plaintiffs argue, because (1) the thrift agreed to raise capital in its capital plan, which was incorporated in the OTS capital directive, and (2) the OTS agreed to release Franklin Federal from the capital directive only to enhance the chances for a successful public offering. The thrift's capital plan "contemplated that Franklin Financial would raise capital in stages, with the final stage being a public offering." Pl. Opp. at 54. According to plaintiffs, Franklin Federal requested, and the OTS granted, release from the capital directive "because both Franklin Federal and OTS recognized that Franklin Financial would have a better chance of raising capital if it were unconstrained by a capital directive, not because plaintiffs 'voluntarily' or 'independently' resorted to the capital markets." Id. at 52 (emphasis in the original).

The court agrees with plaintiffs that all of the transactional costs incurred in 1993 were proximately caused by FIRREA. There is no merit to defendant's argument that the causal link to FIRREA was broken once Franklin Federal achieved regulatory capital compliance in May 1993. To mitigate their damages due to the Government's breach of contract, plaintiffs are entitled to the costs they incurred raising replacement capital for all of the supervisory goodwill lost due to FIRREA, not the bare minimum of replacement capital needed to get Franklin Federal over the regulatory compliance threshold. This is clear from the rulings in Cal Fed, supra, and Bank United of Texas, FSB, et al. v. United States ("Bank United"), 50 Fed.Cl. 645 (2001), in which this court granted awards to the plaintiffs for transaction costs in raising capital to replace supervisory goodwill disallowed by FIRREA even though neither thrift was ever out of regulatory capital compliance. So Franklin Financial is entitled to the transactional costs associated not only with the $2.76 million raised through March 1993, which the OTS deemed sufficient to release Franklin Federal from the capital directive, but also the $3.1 million subsequently raised in the public offering (of which $2.7 million was infused into the thrift). With that fourth infusion Franklin Federal concluded its replacement of supervisory goodwill that FIRREA took away. Thus, all of the transactional costs incurred by Franklin Financial in raising equity capital in 1993 are potentially recoverable.

The parties agree that costs totaling $205,841.79 were incurred in the public stock offering. Accordingly, Franklin Financial is entitled to "wounded bank" damages for those expenditures.

As for the additional $145,000 to $150,000 of transactional costs claimed by Franklin Financial, the present record contains insufficient evidence to permit the court to enter summary judgment for either side. Though the Craine Declaration and the Jones compilation refer to these costs generally as "expenses paid by Franklin Federal and reimbursed by Franklin Financial" in the amount of $134,630.00 and "other expenses" in the amount of $9,997.00, only a fraction of the costs are specifically itemized and even fewer are supported by documentary proof. Even for the costs that are documented, it is not clear from the body of those materials that

the costs were incurred because of FIRREA. Moreover, there is no documentation whatsoever for more than $100,000 of the alleged costs. At trial, plaintiffs will bear the burden of proving the existence of the additional transactional costs it allegedly incurred in 1993, and that they were proximately caused by FIRREA.

## C.

██ Plaintiffs seek "wounded bank" damages of $1,073,000 for Franklin Federal's increased cost of funds resulting from FIRREA. According to plaintiffs, the negative publicity swirling about Franklin Federal in the wake of FIRREA, which threw the thrift out of regulatory capital compliance and threatened it with seizure and liquidation, forced the thrift to increase the interest rates it paid depositors and decrease the rates it charged borrowers in order to attract and retain business. Plaintiffs point to this court's ruling in *Glendale*, 43 Fed.Cl. 390 (1999), in which the plaintiff was awarded "wounded bank" damages for the "historic advantage in cost of funds over its competitors" which was lost because of FIRREA. 43 Fed.Cl. at 408. As stated by the court:

> Glendale's officers and experts also credibly testified to the effect on depositors when a bank falls out of compliance .... [The thrift] also showed that a typical and logical response is to raise rates to both attract and keep deposits. Accordingly, since plaintiff has proved adequately its wounded bank damages, it is entitled to recover these, as .... reliance damages.

*Id.* This finding was not disturbed by the Federal Circuit when it vacated the trial court's damages award, which also included a sizable restitution component, and remanded the case to the Court of Federal Claims "for a determination of total reliance damages to which plaintiff may be entitled." *Glendale, supra,* 239 F.3d at 1385. In accordance with the Federal Circuit's direction, this court proceeded, as part of its "total reliance damages" determination, to reinstate its prior award for the "wounded bank's" loss of historic cost of funds advantage. See *Glendale*, 54 Fed.Cl. at 14.

Despite presenting this claim in the context of its omnibus motion for summary judgment, plaintiff concedes that it presents issues of fact and "requests that the court set aside one day for the parties to present evidence on the issue of cost of funds damages." Pl. Supp. Mem. at 12.

Defendant argues that any purported increase in Franklin Federal's deposit costs is not recoverable because it (a) was not proximately caused by FIRREA, (b) is speculative, and (c) was not foreseeable to regulators at the time of the supervisory conversion. In addition, defendant cites the opinion of its expert, Dr. Sam Peltzman, as demonstrating that:

> no matter what period of [thrift peer] group one examines, none of the estimates of the change in Franklin [Federal]'s alleged cost of funds premium from the pre- to the post-breach period—including [plaintiffs' expert] Dr. Brumbaugh's—is statistically different from zero. This means that there is no basis for concluding that Franklin [Federal] suffered any cost-of-funds disadvantage after the alleged breach.

Def. Supp. Apx. at 337 (¶ 40); see also *id.* at 359 (Exh. 4). Thus, according to defendant, any change in the thrift's cost of deposits after the enactment of FIRREA was insignificant and does not justify an award of damages.

It is clear that the court cannot grant summary judgment to either side on the issue. Plaintiff Charles Robinette has given deposition testimony, backed by contemporary records, that Franklin Federal suffered a decline in deposits during 1990 when it lowered interest rates to depositors in order to please federal regulators. Apx. to Jt. PFUF, Vol. I, at 146–47. According to Robinette, this forced the thrift to reverse course and pay higher interest rates to lure back its customers. *Id.* at 148. In response to a question from Government counsel as to what caused Franklin Federal's loss of depositors, Robinette responded that, in his opinion, it was "the fallout from FIRREA, the institution being listed as being tangibly deficient." *Id.* at 147. In the court's judgment the Robinette deposition presents gen-

uine issues of material fact which should be further explored at trial. Plaintiffs' expert, Dr. Brumbaugh, presents a model which purports to measure Franklin Federal's damages due to increased cost of deposits from March 1990 to March 1994 at more than $1 million. See Apx. to Pl. Opp. to Def. MSJ, Exh. 46 at 12–14, Table 7. Defendant's expert, Dr. Peltzman, challenges the methodology and results of Dr. Brumbaugh's model. He offers an alternative model which concludes that Franklin Federal did not suffer any significant cost-of-funds disadvantage from 1990 to 1994 as a result of FIRREA. Def. Supp. Apx. at 336–37, 359. Thus, the experts' models are in fundamental conflict. Defendant's counter-arguments in favor of summary judgment—i.e., lack of causation and foreseeability, as well as the alleged speculativeness of the thrift's increased cost of funds—offer no rationale for the court to find for defendant as a matter of law.

The court finds that the "increased cost of funds" claim presents genuine issues of material fact which cannot be resolved by summary judgment. This claim must go to trial, where plaintiffs will bear the burden of proof.

### III. *Damages for Dilution of Ownership Interests*

■ The Seven Shareholders claim damages of $5.9 million for the dilution of their ownership interests in Franklin Financial and Franklin Federal which resulted from having to raise capital from outside sources to comply with FIRREA-mandated capital requirements. Absent FIRREA, the Seven Shareholders argue that they would not have needed to raise replacement capital for the supervisory goodwill, would not have done so, and would have continued to own 100 % of Franklin Federal (through Franklin Financial). At the time of the UPC merger in 1996, therefore, the Seven Shareholders assert that they would have received the entire purchase price for the thrift. Instead, they received only a prorated portion of the total sale price—the fraction of the holding company shares represented by the shares the Seven Shareholders bought in the original supervisory conversion in 1989. According to the Seven Shareholders, the difference between the amount they would have received in 1996 as 100 % owners of the thrift and the "prorated portion" of the total sale price they actually received was $5.9 million.

Because of FIRREA, plaintiffs explain, Franklin Financial was forced to raise replacement capital in 1992 and 1993 for infusion into Franklin Federal. Approximately $6 million was raised by Franklin Financial, of which $2.1 million (35 %) came from the original Seven Shareholders and $3.9 million (65 %) came from new investors (see Jt. PFUF, ¶¶ 103, 105). $5.4 million of that capital was infused into the thrift (see id. ¶ 108). The first two capital infusions ($500,000 each) were funded exclusively by the Seven Shareholders. The private stock placement raised an additional $718,000 from the Seven Shareholders and the public offering raised another $400,000 from the Seven Shareholders. New investors purchased $1.041 million of stock in the private placement and $2.857 million of stock in the public offering. The replacement capital infusions were invested in short term instruments, according to plaintiffs, generally earning less than an 8 % return. At that rate the capital infusions would have yielded earnings (net of taxes) of up to $800,000 through October 1996, when the UPC merger took effect. The post-breach infusions ($5.4 million) plus the reinvested earnings ($800,000) equals $6.2 million. Subtracting that figure from $20.6 million—the sale price of Franklin Federal at the time of the merger—yields $14.4 million. According to the Seven Shareholders, that would have been the sale price of the thrift without the capital infusions and they would have received all of it. For their prorated portion of Franklin Federal, however, the Seven Shareholders allege that they received only $8.5 million in 1996. So they are now claiming the difference—$5.9 million.

The court is puzzled by the plaintiffs' arithmetic in calculating the claim. The Seven Shareholders acknowledge that they owned approximately 62.3 % of Franklin Federal, through Franklin Financial, after the fourth and final capital infusion in the summer of 1993 (see Jt. PFUF, ¶ 105), and that they received $11.4 million worth of UPC securities as compensation for their ownership interest in Franklin Federal at the

time of the merger (see *id.* ¶ 115). That ownership interest was comprised not only of the shares the Seven Shareholders originally purchased at the time of the supervisory conversion in 1989, but also the additional shares they purchased in 1992 and 1993. Yet the dilution damages claim, which draws heavily on the expert report and model of Dr. Stulz (Apx. to Pl. Opp. to Def. MSJ, Exh. 47 at 16–18, Apx. D, Table 7), is predicated exclusively on the ownership percentage represented by the shares acquired by the Seven Shareholders in the 1989 supervisory conversion (41.24 %). It ignores the additional shares they acquired in 1992–93, which made their total share of Franklin Financial and Franklin Federal 62.3 % at the time of the UPC merger. Even assuming, *arguendo*, that Franklin Federal without the infusions from new investors in 1993 would have been worth $14.4 million at the time of the merger in 1996 (an assumption that defendant rejects), the Seven Shareholders' dilution damages claim would only come to $3 million ($14.4 million minus $11.4 million).

Defendant argues that no dilution damages are warranted in any event. Defendant rejects the plaintiffs' dilution damages theory as "speculative" and "fanciful" (Def. MSJ at 73), as well as "defective" (Def. Reply at 34). Dr. Stulz's model is faulty, defendant asserts, because it is not based on actual costs. Defendant also contends that the Seven Shareholders were only required by federal regulators to infuse $3 million (not $5 million) into Franklin Financial at the time of the supervisory conversion in 1989, that $2 million of that initial infusion was voluntary rather than contractual. According to defendant, therefore, the $5 million of stock they initially acquired is the wrong starting point for calculating subsequent dilution damages. Defendant's argument is undermined by the language of the goodwill contract which, in the court's view, clearly contemplated an initial infusion of $5 million. On the other hand, plaintiffs' assertion that they would never have allowed their ownership interests in the holding company and the thrift to be diluted, had FIRREA not forced their hand, also appears questionable considering the fact that the public stock offering, in the summer of 1993, took place after Franklin Federal had achieved regulatory capital compliance and was no longer subject to any capital plan or OTS directive.

In any event, the court is persuaded that there are genuine issues of material fact with respect to the claim for dilution damages which should be resolved at a trial. Accordingly, summary judgment is denied to both sides.

### IV. *Damages for Unexercised Stock Options*

Plaintiff Charles G. Robinette claims damages of $366,452 for the value of the shares in Franklin Financial he allegedly would have purchased, pursuant to a stock option clause in his employment contract, had FIRREA not robbed him of any economic incentive to do so by rendering Franklin Financial stock "worthless" during the option period. Under his initial three-year employment contract with Morristown, which ran from March 1988 to March 1991, Robinette had an option to buy up to 4 % of Franklin Financial's stock at the original capitalization price of $10.00 per share. Had he exercised that option, Robinette could have purchased an additional 20,833 shares of Franklin Financial stock for a total price of $208,330. Robinette asserts that he intended to exercise that option, but that FIRREA's elimination of Franklin Federal's goodwill left the thrift insolvent and subject to takeover, thus rendering the stock option right, in his mind, worthless.

Franklin Financial stock was worth considerably more than $10.00 per share at the time of the UPC merger in 1996. The price had risen to $17.00 per share by that time. UPC stock, meanwhile, was worth $31.25 per share. In the merger agreement, therefore, Franklin Financial received one share of UPC stock for every 1.838 shares of Franklin Financial stock, reflecting the relative values of the two stocks. At $17.00 per share (an increase of $7.00 from the contractual option price), Robinette calculates his *minimum damages* as $145,831 (20,833 shares times $7.00). However, since Franklin Federal would allegedly have been worth only $14.4 million at the time of the UPC merger in the absence of the post-breach infusions of 1992–93 (as calculated by plaintiffs in the foregoing

section), the value of Franklin Financial stock would allegedly have increased to $27.59 per share ($14,371,000 divided by 520,-833 shares then outstanding). Robinette's stock would therefore have increased in value by $17.59 per share, yielding a *total damages* figure of $366,452 (20,833 shares times $17.59).

Defendant opposes Robinette's claim on several grounds. First, defendant argues that Robinette should be estopped from claiming damages for his unexercised stock options because the plaintiffs did not plead a breach of Robinette's employment contract in their original complaint. Second, defendant contends that Robinette was not prevented from exercising his option by any provision in FIRREA that the choice not to do so was his own voluntary business decision. Third, defendant asserts that Robinette's valuation of the unexercised option improperly employs *post hoc* reasoning, using the price paid for the shares in 1996 rather than the value at the time of breach.

■ The court rejects defendant's argument that Robinette should be estopped from bringing his claim. It is irrelevant that the complaint did not specifically plead that Robinette's employment contract had been breached by FIRREA. The complaint alleged, *inter alia*, that the United States breached its goodwill contract with the plaintiffs, one of whom is Robinette, and that the plaintiffs were damaged as a result. The complaint did not set forth all of their damages theories, which have evolved in tandem with *Winstar*-related case law. Nor did the complaint specify the amount of damages sought, which the plaintiffs pleaded should be determined by the court in a trial. But it is clear to the court that Robinette's stock option claim is within the ambit of damages which could be seen as flowing directly from FIRREA.

■ In the court's view, it is a genuine issue of material fact as to whether Robinette's decision not to exercise his stock options was proximately caused by FIRREA. For example, although the three-year employment contract he signed in 1988 gave Robinette until 1991 to exercise his options, the record is unclear as to whether that right

was extended under one or more subsequent employment contracts which Robinette presumably executed with Franklin Federal (since he continued to serve as president and CEO of the thrift up until the UPC merger in 1996). Assuming causation is established, the valuation of plaintiff's stock option damages presents another issue of material fact.

Accordingly, the court denies summary judgment to both sides on this claim.

## V.

As the final two items of their damages action, the plaintiffs seek a trial on (A) lost profits and (B) the cost of replacing the supervisory goodwill eliminated by FIRREA with tangible capital. Defendant has moved for summary judgment on both of these claims, primarily on the grounds that the damages theories are legally defective and the losses claimed are speculative. Plaintiffs contend that there are issues of material fact in dispute which preclude summary judgment for defendant.

### A. *Lost Profits*

■ In presenting their lost profits claim, the Franklin Plaintiffs rely primarily on the expert report and model of Dr. Brumbaugh (Exh. 46, Apx. to Pl. Opp. to Def. MSJ). According to Brumbaugh, Franklin Federal's lost profits from the time FIRREA breached the goodwill contract in 1989 until the time of the merger with UPC in 1996 was $2,087,000. To that amount Brumbaugh adds $322,200 for "future lost profits" after the UPC transaction.

The basis of the claim for lost profits, as Dr. Brumbaugh explains, is that the Government's breach of contract denied Franklin Federal the right to count all of its supervisory goodwill as regulatory capital, thereby reducing the thrift's capital and its ability to hold earning assets and earn spread income. The breach not only limited Franklin Federal's ability to grow, Brumbaugh states, but also caused it to shrink as assets fell from $106 million at the end of 1989 to $94 million in 1990. Not until 1993, with the help of the $5.437 million of additional capital infused in 1992–93, did the thrift climb back to and surpass its 1989 assets level.

To measure Franklin Federal's lost earnings, Dr. Brumbaugh indicates, certain assumptions must be made about what the thrift would have done absent the breach, starting with its growth rate. Noting that Franklin Federal grew modestly during the first three quarters of 1989, but shrank in the fourth quarter after FIRREA was enacted, Brumbaugh assumes that the growth rate of the first three quarters would have been replicated in the fourth quarter, but for the breach. The asset shrinkage in 1990 would have been avoided, but for the enactment of FIRREA, and Brumbaugh assumes that the 1990 growth rate would have been the average of the 1989, 1991, and 1992 "but-for" rates, which he calculates at 3.34 %. This percentage is in line with the May 1988 pro forma submitted with the supervisory conversion application, which forecast a growth of 3.73 % in 1990. For the years 1991 to 1996 Dr. Brumbaugh uses Franklin Federal's actual growth rate each year, adjusted for goodwill amortization and the capital infusions of 1992–93.

After determining the thrift's growth rate, Dr. Brumbaugh proceeds to profitability. The lost profits model he presents is based on the profitability of the existing assets and liabilities. The "but-for" earnings, Brumbaugh explains, are Franklin Federal's actual earnings plus the incremental earnings that the thrift would have made on the incremental assets it would have had but for the breach. As a result of the increased cost of deposits the thrift was allegedly forced to pay because of FIRREA, Brumbaugh calculates a 27 basis point (i.e., 0.27 %) increase in Franklin Federal's deposit costs relative to its peers during the years 1990–93. The thrift's "but-for" return on assets for each of these years, therefore, would have been the actual return plus this increased cost of deposits. By June 1994 Franklin Federal no longer faced increased deposit costs due to FIRREA, Brumbaugh states, so thereafter the thrift's "but-for" return in the lost profits model is the same as its actual return.

In Table 4 of his lost profits damages model, Dr. Brumbaugh compares Franklin Federal's actual assets for the years 1989–1996 with the assets the "but-for" thrift would have had in the absence of FIRREA. These are the earnings the thrift lost, Brumbaugh asserts, due to the premature elimination of its supervisory goodwill as regulatory capital. Brumbaugh calculates the "incremental pre-tax, pre-amortization income" for those years (i.e., the amount by which the thrift's actual income would have increased had FIRREA not been enacted) as follows: 1989—$8,000; 1990—$58,000; 1991—$248,000; 1992—$396,000; 1993—$510,000; 1994—$374,000; 1995—$355,000; 1996—$137,000. Thus, Dr. Brumbaugh pegs Franklin Federal's total lost profits damages at $2,087,000.

In addition, even though Franklin Federal ceased to exist after the UPC merger in 1996, Dr. Brumbaugh asserts that the Franklin Plaintiffs suffered lost profits beyond that point in time. Absent FIRREA, he explains, UPC would have acquired with Franklin Federal additional regulatory capital equal to the remaining (as yet unamortized) contractual goodwill. With this additional regulatory capital the thrift would have had additional leverage and could have generated additional earnings. In his lost leverage model (Exh. 46, Table 6, Apx. to Pl. Opp. to Def. MSJ) Brumbaugh calculates the lost earnings on Franklin Federal's unreplaced supervisory goodwill after the UPC transaction. The model calculates the additional assets which could have been supported by the unreplaced supervisory goodwill, and the earnings which could have been generated thereby. Because Franklin Federal raised a significant amount of capital in 1992–93, the balance of disallowed goodwill exceeds the amount of capital raised only until 1999. So the model ends in that year. Based on a core capital ratio of 8 % and a 1.94 % return on investment (which were the thrift's actual averages in the years 1993–1996) Brumbaugh calculates lost leverage damages as follows: 1996 (final quarter)—$55,400; 1997—$169,400; 1998—$85,800; 1999—$11,600. Thus, Dr. Brumbaugh pegs Franklin Federal's total damages for lost leverage on unreplaced supervisory goodwill at $322,200.

Defendant has moved for summary judgment on the lost profits claim, asserting that

Dr. Brumbaugh's model contains incorrect assumptions and fails to reflect the fact that Franklin Federal was in regulatory capital compliance by 1993. In order to prevail on its claim, defendant points out, Franklin Federal must prove a direct nexus between the alleged injury and the breach. The damages must have been foreseeable by the parties when entering into the contract. See *Bighorn Lumber Company, Inc. v. United States,* 49 Fed.Cl. 768, 773 (2001). Remote or consequential damages cannot be recovered. See *CCM Corp. v. United States,* 15 Cl.Ct. 670, 671 (1988). Dr. Brumbaugh's lost profits model is "purely speculative," according to defendant, and has at least two major flaws. First, there is no evidence that Franklin Federal's new assets would have produced the same return as its pre-existing assets, since Brumbaugh provides no information about the kinds of investments the thrift would have made absent FIRREA. Second, there is no evidence that the thrift faced additional costs for its deposits as a result of FIRREA, since Morristown had historically paid more for its deposits, on average, than other thrifts in Tennessee. So it is speculative to add 27 basis point to Franklin Federal's assumed return on assets. Defendant argues that the plaintiffs cannot carry their burden of demonstrating that FIRREA was the "immediate" cause of Franklin Federal's shrinkage after August 1989. Nor, in defendant's view, was it within the contemplation of federal regulators (*i.e.,* foreseeable) at the time of Morristown's supervisory conversion that the thrift would be restored to profitability through goodwill amortization alone. Morristown had lost money prior to FIRREA, defendant points out, and Franklin Federal's board of directors contained many of the same individuals who had served on Morristown's board and allegedly mismanaged the thrift.

Defendant cites several *Winstar*-related cases in support of its summary judgment motion on lost profits. In *Cal Fed, supra,* the Federal Circuit stated that the plaintiff could recover lost profits if (a) it is definitely established that profits would have been made, (b) their loss was the proximate result of FIRREA, and (c) there is some basis to reasonably estimate the amount of the prof-

its. See 245 F.3d at 1349. In allowing Cal Fed's lost profits claim to proceed to trial, defendant argues, the Federal Circuit was swayed by the evidence plaintiff submitted of specific assets it was forced to sell due to FIRREA, while ignoring plaintiff's more speculative claims of lost opportunities. In the case at bar, on the other hand, defendant contends that there is no evidence of lost profits by Franklin Federal aside from Mr. Robinette's unsubstantiated statement that "[t]he Bank also suffered deposit run-off." Exh. 52, ¶ 4, Apx. to Pl. Opp. to Def. MSJ.

In *Bank United, supra,* this court rejected the plaintiffs' claim for lost profit damages. While basing its ruling on the fact that the plaintiffs were able to mitigate potential damages from FIRREA, the court also observed that the plaintiffs' lost-profit models were "filled with speculation upon speculation and thus do not establish lost profits with reasonable certainty." 50 Fed.Cl. at 654. This is akin to the case at bar, defendant asserts, in which the "plaintiffs' lost profits theory founders upon many speculative assumptions about the amount of capital Franklin Federal would have raised, what assets it would have retained, what assets it would have sold, how the retained assets would have been financed, the amount of additional assets Franklin Federal would have held, the types of additional assets that it would have held, and how profitable the retained and additional assets would have been." Def. Supp. Br. at 13.

In *Suess, supra,* this court again rejected a claim for lost profits, finding that "[t]he evidence is overwhelming that [the failed thrift] had no demonstrated history of generating core earnings" and that the plaintiffs had, *inter alia,* "fail[ed] to prove their lost profits damages with reasonable certainty." 52 Fed. Cl. at 228–29. In addition, the court found that the "plaintiffs' damage model is premised on unrealistic assumptions and produces an absurdly high damage figure that bears almost no relation to [the thrift] as a going concern." *Id.* at 229. The same applies to Dr. Brumbaugh's lost profits model, defendant argues.

The court is not persuaded that defendant should be granted summary judgment on the plaintiffs' lost profits claim. To the contrary, the court finds that there are issues of material fact in dispute which preclude deciding this claim as a matter of law. For example, with respect to defendant's allegation that Dr. Brumbaugh's damages model provides no information about the kinds of investments Franklin Federal would have made absent FIRREA, plaintiffs have submitted a declaration of plaintiff Charles Robinette, the thrift's president and CEO, that he consistently invested Franklin Federal's assets in shorter term, lower risk investments from the time of the supervisory conversion in 1989 until the UPC merger in 1996, and would have done the same even if FIRREA had not eliminated supervisory goodwill from the thrift's regulatory capital. See Exh. 52, ¶ 2 and ¶ 3, Apx. to Pl. Opp. to Def. MSJ. Robinette also declared that Franklin Federal suffered deposit run-off, was prohibited from making certain loans, and, contrary to defendant's assertion, did pay more for its deposits as a result of FIRREA. Additional documentation in the record speaks to these issues as well. *Id.* at ¶ 4. As for defendant's argument that it was not contemplated, or foreseeable, by federal regulators that the supervisory conversion of Morristown would restore the thrift to profitability through goodwill amortization alone, plaintiffs cite a wealth of documentation which makes it clear, in plaintiffs' view, that the post-conversion viability of the thrift was a central focus, indeed condition, of the goodwill contract. See. Pl. Opp. to Def. MSJ at 58–59.

The case law in other *Winstar*-related cases, including those discussed above by defendant, confirms this court's judgment that the instant claim for lost profits damages should go to trial. In *Cal Fed* the Federal Circuit, in overturning a summary judgment ruling of the Court of Federal Claims, stated as follows:

> *Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute.* RCFC 56(c). Cal Fed submitted considerable evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits. *The Court of Federal Claims erred by not permitting Cal Fed to present its evidence at a trial* based on its legal conclusion that the proof would be too speculative. We therefore vacate the summary judgment on lost profits and remand for trial on the issue.[9]

245 F.3d at 1350 (emphasis added). In *Glendale, supra,* the Federal Circuit likewise recognized the right of plaintiff to go to trial on its claim for lost profits, while cautioning that the threshold of proof was high:

> The problems of proof attendant on the burden placed on the non-breaching party of establishing lost profits—on establishing what might have been—are well recognized. Even with a generous standard of proof applied in such cases [citations omitted] the proof problem can in some situations prove to be insurmountable.

239 F.3d at 1380. The Federal Circuit observed that Glendale had not presented convincing evidence of lost profits (or other expectancy damages) at trial.[10] As the Federal Circuit explained, the Court of Federal Claims "concluded that *on the facts of the case* Glendale was not entitled to expectancy [including lost profits] damages." *Id.* (em-

---

9. On remand, the Court of Federal Claims denied plaintiff's lost profits claim, after a six-week trial, on the grounds that Cal Fed failed to prove (1) that it lost profits as a direct result of the breach of the goodwill contract, (2) that the loss of profits was foreseeable by the Government, and (3) that the lost profits could be estimated with reasonable certainty. See *California Federal Bank v. United States,* 54 Fed.Cl. at 705–06 (2002). These were the three criteria for establishing a lost profits claim that the Federal Circuit recently summarized in *Energy Capital Corp.*

*v. United States,* 302 F.3d 1314, 1325 (Fed.Cir. 2002). See *id.* at 709–10.

10. Glendale's evidence at trial included a lost profits model and the testimony of financial experts, federal regulators, and officers of the thrift. After considering all of this evidence the Court of Federal Claims rejected plaintiff's lost profits claim, finding that its model was "unreliable" and the alleged lost profits "too remote and speculative." 43 Fed.Cl. at 400–401.

phasis added). Glendale did not appeal the trial court ruling in the Federal Circuit.

Neither *Bank United* nor *Suess* is helpful to defendant. In both of those cases the Court of Federal Claims rejected the plaintiffs' lost profits models and their claims for lost profits damages, but only after trials on the merits. In neither case did the court indicate that the lost profits claims were disposable without a trial. Along the same line, this court denied the Government's motion for summary judgment on plaintiff's lost profits claim in *Citizens, supra,* 52 Fed.Cl. at 563–64 (2002). ("[B]ecause the Court finds certain material facts in dispute, summary judgment either for Defendant or for Citizens is inappropriate.") The court also denied summary judgment for the Government on a lost profits claim in *Columbia First Bank, FSB v. United States,* 54 Fed.Cl. 693, 702 (2002) *("Columbia").* ("[P]laintiff .... has presented substantial documentary, deposition, and expert evidence..... [T]he court cannot find the absence of a genuine issue of material fact on this record. Therefore, summary judgment on the issue of lost profits is not appropriate ....")

In short, there is no *Winstar*-related case law supporting the Government's contention that this court should rule for defendant as a matter of law on the Franklin Plaintiffs' lost profits claim. The crux of the Federal Circuit's rulings in *Cal Fed* and *Glendale,* and this court's rulings in *Glendale, Bank United, Suess, Citizens,* and *Columbia,* is that the plaintiffs were entitled to their day in court, regardless of their prospects for success and the difficult standard of proof, as long as they offered enough evidence to raise a genuine issue of material fact. As previously discussed, the evidence submitted by the Franklin Plaintiffs in regard to their alleged lost profits raises significant issues of material fact that precludes disposition of the claim as a matter of law. Accordingly, defendant's motion for summary judgment on the plaintiffs' lost profits claim must be denied.

In order to prove their claim at trial plaintiffs must demonstrate that Franklin Federal, based *inter alia* on its prior earnings record, would definitely have earned additional profits and that the loss of such profits was both directly caused by FIRREA and foreseeable by the Government. Hypothetical models alone will not suffice. To date, none of the *Winstar*-related trials on lost profits (*e.g., Glendale, Bank United, Suess, Cal Fed* ), some of which have been quite lengthy, has resulted in any award for the plaintiff. *Verbum sat sapienti!*

## B. *Cost of Replacement Capital*

 In presenting their claim for the cost of replacing the supervisory goodwill eliminated by FIRREA with tangible capital, the Franklin Plaintiffs rely on the expert report and models of Dr. Stulz (Exh. 47, Apx. to Pl. Opp. to Def. MSJ). In his report Dr. Stulz discusses two different theories of measuring the cost to Franklin Federal of replacing supervisory goodwill with capital and calculates the amount of each. According to Dr. Stulz, (1) the cost to the thrift of not being able to count its supervisory goodwill as regulatory capital over the full 25–year amortization period (*i.e.,* the value of the disallowed goodwill as measured by what it would have cost to replace it with real capital) was between $14.4 and $21.2 million, and (2) the actual cost to Franklin Federal of partially replacing the disallowed goodwill through capital infusions in 1992 and 1993 was $12.7 million. The plaintiffs do not explain whether these alleged costs constitute cumulative or alternative claims, though it appears to the court that plaintiff meant to present them as alternative theories of recovery.

### Value of the disallowed goodwill

To compute the cost of replacing Franklin Federal's supervisory goodwill, Dr. Stulz assumes that the thrift issues preferred stock for the amount of disallowed goodwill at the end of 1989—allegedly $7.604 million.[11] The net cost of replacing the goodwill is the cost of issuing the preferred stock plus the divi-

---

11. Dr. Stulz does not explain where he got this figure. The record includes correspondence from Franklin Federal to the OTS in early 1990 stating that the thrift's supervisory goodwill at the end of 1989 stood at $8,122,000. See Apx. to

Jt. PFUF, Vol. I, at 329, 342, 346–349. An FDIC internal memorandum, dated March 1, 1990, indicates that Franklin Federal amortized $1,269,000 of goodwill in 1989. See *id.* at 358.

dends paid to the stockholders over the years, minus the income earned from investing the proceeds of the preferred stock. Stulz assumes the proceeds are invested in low risk investments that earn 8 % per annum. Drawing on finance literature, Dr. Stulz estimates the cost of issuing the preferred stock at 15.96 % of the offering size— or $1.3 million—based on the $7.604 million balance of Franklin Federal's supervisory goodwill which, according to Stulz, was disallowed on December 31, 1989.[12] After grossing up the dividend payments to account for taxes and discounting the payments at the rate of 6 % to the end of 1999, Stulz estimates the cost of replacement capital at $14.4 million (based on a "conservative dividend yield of 15 %") or $21.2 million (based on "the more reasonable dividend yield of 20 %"). See Pl. Exh. 47 at 11; Apx. A. In explaining "why the estimate is so large," Dr. Stulz asserts that "capital is risky" and "there is a cost of replacement capital each year over the life of the contract." Pl. Exh. 47 at 11. "[T]he cumulative cost is large compared to the amount raised," Stulz concludes, "because the cost is paid annually over a long period of time." *Id.*[13]

### Cost of partially replacing goodwill

The $12.7 million Dr. Stulz calculates as the cost incurred by Franklin Federal in actually replacing part of its disallowed supervisory goodwill through equity infusions in 1992 and 1993 consists of the cost of the infusions up until the UPC merger in 1996, $8.3 million (after tax), plus $4.4 million (after tax) for the future cost of the infusions at the time of the UPC transaction using a hypothetical issuance of preferred stock. According to Stulz, the portion of Franklin Federal accounted for by the four infusions in 1992–93 (totalling $5.4 million) had a value

of $10.6 million at the time of the UPC transaction in 1996. Adding in the dividends on that infused capital which were paid by the thrift to the holding company between 1993 and 1996 increases the total amount paid for the capital by the thrift to $11.2 million. From that figure Stulz offsets the $5.4 million Franklin Federal received in the infusions, plus the after-tax earnings on those infusions amounting to $0.8 million. That leaves a net after-tax cost of replacement capital equal to $5 million, which Stulz grosses up to $8.3 million to account for taxes (assuming a 40% tax rate). See Pl. Exh. 47, Apx. B. Since this figure represents the cost of replacement capital only up to the UPC transaction in 1996, Dr. Stulz also computes the cost of capital after the UPC transaction based on a hypothetical issuance of preferred stock in the same amount as the equity infusions. Stulz discounts future costs back to the end of 1999 at the "risk-free rate of 6%," assumes the cost of capital in 1996 was 10% and the offsetting benefit of cash earnings on the tangible assets was 7% (the "risk free rate in 1996"), and arrives at a figure of $4.4 million as the cost of replacement capital after the UPC transaction. See Pl. Exh. 47 at 16, Apx. C. Thus, Dr. Stulz calculates the total cost of partially replacing Franklin Federal's disallowed goodwill at $12.7 million.

Defendant has moved for summary judgment on the plaintiffs' "cost of replacement capital" claim. According to defendant, Dr. Stulz's preferred stock models for measuring the value of Franklin Federal's disallowed goodwill (*i.e.*, the cost of replacing it with tangible capital) are too speculative and have been discredited in other *Winstar*-related cases. While Stulz calculates the Franklin Plaintiffs' damages at double or triple the value of the disallowed goodwill, for example, the Federal Circuit in *Glendale* vacated a

---

12. The effective date of FIRREA was December 7, 1989, when the implementing regulations took force. See *Plaintiffs in Winstar–Related Cases v. United States*, 37 Fed.Cl. 174, 191 (1997).

13. A cheaper option, Dr. Stulz acknowledges, would have been for the Seven Shareholders to borrow on personal account. Assuming they could not have borrowed an additional $7.6 million at the end of 1989 (they had already borrowed $4.5 million at the beginning of that year)

at a rate less than 11.25 % (or 75 basis points above the prime rate in December 1989), Stulz calculates the cost to the Seven Shareholders of replacing Franklin Federal's disallowed goodwill through direct borrowing at $7.9 million. This figure takes into account the benefit of investing the proceeds of the loan at the low risk rate of 8 %, but not the added cost of the guarantees the lender(s) would have required from the shareholders.

restitution award of the Court of Federal Claims for the *book value alone* of the thrift's goodwill (at the time of the supervisory merger), 239 F.3d at 1381–82. In the underlying trial court opinion, the Court of Federal Claims had already rejected Glendale's argument that the cost of recapitalizing the thrift to replace its phased-out supervisory goodwill was a figure nearly three times the amount of capital actually raised (akin to the multiple claimed by the Franklin Plaintiffs), based on a model "calculating the total cash outflows to investors in the recapitalization while subtracting the cash inflows from investing in the recapitalization proceeds." 43 Fed.Cl. at 401. As the court stated, "[t]here is something inherently odd about this alternative cost of capital estimate. In essence, plaintiff is contending that its capital cost over two and a half times the capital raised . . . . . The court does not find this to represent a plausible cost of the capital." *Id.* at 401–02. Instead, the court awarded Glendale the transaction costs it incurred in raising the replacement capital. See *id.* at 409.

In *Cal Fed,* defendant points out, the Federal Circuit affirmed a Court of Federal Claims ruling that rejected plaintiff's claim for the cost of replacement capital which a Cal Fed expert had pegged at approximately two and a half times the amount of the lost goodwill. (This multiple, as in *Glendale,* was roughly the same as that claimed in the case at bar.) The damages claimed by Cal Fed included the cost of a theoretical repurchase of all the stock issued by the thrift to eliminate dividend payments. In the trial court's judgment the testimony of plaintiff's expert lacked credibility and his model produced "inflated costs." 43 Fed.Cl. at 461. The court agreed with the Government's expert that "the only costs [of raising capital] are transaction, or flotation costs." *Id.* The Federal Circuit observed in its opinion that "[t]he [trial] court found Cal Fed's experts not credible." 245 F.3d at 1350. The Federal Circuit also stated that "[w]e see no clear error in the [trial] court's finding that the floatation [*i.e.,* transaction] costs provided an appropriate measure of Cal Fed's damages incurred in replacing the supervisory goodwill with tangible capital." *Id.*

In *Landmark, supra,* where the FDIC (as plaintiff-intervenor) limited its goodwill claim to the unamortized portion of the failed thrift's goodwill which FIRREA eliminated, the Federal Circuit (prior to its conclusion that the FDIC lacked standing) observed that the Court of Federal Claims had denied the FDIC's claim for failure to prove the value of the lost goodwill. The FDIC's expert had presented a model for valuing lost goodwill based on the cost to a private institution of raising replacement capital through preferred stock, depositing the stock in treasury securities, and subtracting the income earned on the securities. But the model's costs were theoretical, the court stated, and not supported by trial testimony as to what costs, if any, the thrift actually incurred before its failure in 1990. See 46 Fed.Cl. at 273–74. The Federal Circuit also noted that, although Landmark (the owner of the failed thrift) did not similarly seek compensation for the value of its lost goodwill, in *Glendale* the Federal Circuit had vacated the trial court's award for the book value of supervisory goodwill lost due to FIRREA "because the plaintiff had put forth no evidence to establish the actual value of the lost goodwill, instead arguing that goodwill was equivalent to cash." 256 F.3d at 1379, note 6.

In *Bank United, supra,* the Court of Federal Claims rejected plaintiff's model that calculated a hypothetical cost to the thrift of $117 million to raise $228 million of capital to replace goodwill eliminated by FIRREA. Like Dr. Stulz's model in the case at bar, the Bank United model postulated that the thrift would have paid annual dividends of 20 % on the hypothetical preferred stock and would have earned roughly 7 % on risk-free government bonds into which the stock proceeds would have been invested. The court dismissed the model as "absurd on its face," 50 Fed.Cl. at 656, and discussed several of its defects. First and foremost was the incorrect assumption that all of the lost goodwill had to be immediately restored when FIRREA took effect in December 1989. The Act did not knock Bank United out of capital compliance (like it did Franklin Federal), so Bank United could have restored its capital ratio as needed "on a piecemeal basis." *Id.* The model also failed to account for the fact

that supervisory goodwill was not eliminated all at once, but rather over a five-year phase-in period. As in *Glendale* and *Cal Fed,* the court awarded plaintiff the transaction costs it incurred in raising replacement capital.

In contrast to the foregoing cases, plaintiffs argue that the Court of Federal Claims did adopt a cost of replacement capital model similar to that offered by Dr. Stulz in *Glass, et al. v. United States,* 47 Fed.Cl. 316, 327–29 (2000) ("*Glass*"), *rev'd on other grounds,* 258 F.3d 1349 (Fed.Cir.2001), *reh'g denied,* 53 Fed.Cl. 33 (2002). To measure the cash value of the supervisory goodwill eliminated by FIRREA the FDIC, as plaintiff-intervenor on behalf of a failed thrift, presented a model by its expert seeking to measure the cost of replacing the goodwill with cash using the hypothetical of a preferred stock issuance. The plaintiff's model, it should be pointed out, resulted in a damages figure for lost goodwill ($2.081 million) that was only a fraction (approximately 37 %) of the face amount of the goodwill on the date of breach ($5.595 million), not a multiple thereof as calculated by Dr. Stulz in the case at bar. The Court of Federal Claims accepted plaintiff's model in *Glass,* reasoning as follows: "[The failed thrift's] right to use supervisory goodwill on its books was taken away by FIRREA. Damages are sought to replace that asset. Those damages cannot be calculated without accounting for the cost of replacement..... The model represents damages, a value calculation for the usefulness of something that was contracted for, not an actual transaction." 47 Fed.Cl. at 328–29. The court's award was subsequently vacated by the Federal Circuit, however, on the grounds that the FDIC was not a proper party to the action. 258 F.3d at 1356. The Federal Circuit did not address the merits of the goodwill replacement model.

A major difference between *Glass* and the case at bar, however, is that the thrift in *Glass* (Security Savings Bank) failed shortly after FIRREA was enacted. The thrift made no attempt to replace disallowed supervisory goodwill with actual capital before the OTS took it over in 1990. The Court of Federal Claims adopted plaintiff's hypothetical preferred stock model as a method to measure the cost of replacing goodwill with capital. Unlike the failed thrift in *Glass,* Franklin Federal survived FIRREA, was infused with $5.437 million of actual capital to replace the bulk of its disallowed goodwill, and proceeded to prosper. The factual scenario in the case at bar is akin to that in three of the cases discussed above—*Glendale, Cal Fed,* and *Bank United*—in which the subject thrifts, like Franklin Federal, survived FIRREA. In each of those cases the Court of Federal Claims rejected hypothetical preferred stock models and calculated damages based on the *actual costs* incurred by the plaintiffs in raising *actual capital* to replace their lost goodwill.[14]

Thus, in *Glendale* the Court of Federal Claims rejected plaintiff's model claiming that it cost $1.207 billion to raise $451 million of replacement capital. "There is something inherently odd about this alternative cost of capital estimate," the court stated. 43 Fed. Cl. at 401. "[E]lementary principles of finance suggest that plaintiff received $451 million and paid $451 million for that money." *Id.* at 401–02. The court awarded plaintiff $24.235 million for the transaction costs incurred in raising the capital. See *id.* at 409. This award was technically vacated by the Federal Circuit (see 239 F.3d at 1384), but was reinstated by the trial court in its remand decision awarding plaintiff reliance damages. See 54 Fed.Cl. at 14. In *Cal Fed* the Court of Federal Claims indicated that the testimony of plaintiff's expert that it cost nearly $1 billion to raise roughly $440 million in capital (of which $93.5 million was raised through a convertible preferred stock offering) lacked credibility. The court determined that Cal Fed was entitled to $23.353 million for the transaction costs incurred in raising the capital, of which $4.3 million were associated with the stock offering. "Any amounts greater than these expenses," the court stated, "would be more than necessary

14. In *Landmark, supra,* the Court of Federal Claims likewise rejected a hypothetical preferred stock model, and denied plaintiff any damages award, because no evidence had been submitted that the thrift actually tried to raise replacement capital, or incurred any costs therefor, prior to its failure.

to make Cal Fed whole." 43 Fed.Cl. at 461. This ruling was affirmed by the Federal Circuit. See 245 F.3d at 1350. In *Bank United*, as previously discussed, the Court of Federal Claims rejected as "absurd on its face" plaintiff's model claiming that it cost $117 million to raise $228 million of replacement capital. 50 Fed.Cl. at 656. Instead, the court awarded transaction costs totalling $8,826,783. That sum included $3,942,500 for the costs of raising $85.5 million of the capital through a preferred stock issuance. See *id.* at 665.

As the foregoing *Winstar*-related case law clearly demonstrates, the Court of Federal Claims has soundly rejected theoretical preferred stock models for calculating the cost of replacing lost goodwill with equity capital which yielded damages figures far in excess of the capital actually raised by a surviving thrift. In *Glendale*, Cal Fed, and *Bank United* the court focused on the actual costs the thrifts incurred, determined that they were the transaction costs of raising the new capital, and granted awards therefor. In *Cal Fed* the trial court's ruling was specifically upheld by the Federal Circuit. ("We see no clear error in the court's finding that the floatation costs [*i.e.*, transaction costs] provided an appropriate measure of Cal Fed's damages incurred in replacing the supervisory goodwill with tangible capital." 245 F.3d at 1350.) *Landmark* is consistent with those three cases, rejecting the plaintiffs' theoretical preferred stock model because there was no evidence that any actual costs were incurred in raising replacement capital before the thrift failed.

Moreover, in *Columbia, supra,* the court for the first time rejected *by summary judgment* a cost of capital replacement claim which was based on a hypothetical damages model. The thrift in that action was never out of regulatory capital compliance and chose, for its own business reasons (in particular, the economic conditions of the time), not to replace the supervisory goodwill eliminated by FIRREA. Thus, the thrift did not incur any actual capital replacement costs. "The decision to forego raising capital was a business decision," the court observed. 54 Fed.Cl. at 699. "Plaintiff may have been dam-

aged .... by the breach, but that damage was neither caused nor increased by mitigation costs, and the court sees no reason to use hypothetical mitigation costs as a measure of damages now." *Id.*

The Court of Federal Claims did adopt a cost of replacement model based on a hypothetical preferred stock issuance in *Glass*, but that ruling has minimal legal weight because it was issued prior to the Federal Circuit's decision in *Cal Fed* and the award was vacated by the Federal Circuit (albeit on the unrelated issue of the FDIC's standing). Moreover, *Glass* is factually distinguishable from the case at bar because the thrift failed shortly after FIRREA and did not actually raise any replacement capital, or incur any costs therefor, prior to its failure. In any event, if the Federal Circuit had needed to make a substantive ruling on the cost of replacement capital claim, its decisions in *Cal Fed* (upholding the trial court's award of transaction costs alone) and *Glendale* (remanding the case to the trial court for a calculation of plaintiff's "actual losses") suggest to this court that the Federal Circuit would have rejected the hypothetical preferred stock model in *Glass*.

Though most of the foregoing cases were decided after damages trials (*Columbia*, however, on summary judgment), the court does not see the utility of submitting another cost of replacement capital claim to trial based on a damages model which is similar to, and just as far afield, as those emphatically rejected by this court in *Glendale* ("inherently odd"), *Cal Fed* ("not credible"), and *Bank United* ("absurd on its face"). As in *Glendale* and *Cal Fed*, where the plaintiffs presented models projecting costs of raising replacement capital that were (a) several times greater than the capital actually raised and (b) 40 to 50 times greater than the actual transaction costs awarded by the court, the Franklin Plaintiffs assert theoretical costs for replacing Franklin Federal's supervisory goodwill—$14.4 million to $21.2 million—or partially replacing its goodwill—$12.7 million—that (a) far outstrip the amount of capital actually raised by Franklin Financial ($6 million) or infused in Franklin Federal ($5.4 million) to replace most (all but $1 million) of

the thrift's supervisory goodwill and (b) dwarf the actual transaction costs—roughly $350,000—of raising that capital. Dr. Stulz's model is just as speculative, and divorced from the actual costs of the thrift it purports to measure, as the similar models that have been repeatedly rejected in other *Winstar*-related cases.

Accordingly, the court finds no merit to plaintiffs' claim, based on Dr. Stulz's model, that the cost of replacing all of Franklin Federal's disallowed goodwill with real capital was between $14.4 million and $21.2 million, or that the cost of partially replacing the thrift's goodwill with real capital was $12.7 million. The court grants summary judgment for defendant on this claim.[15] As this court and the Federal Circuit have determined in other *Winstar*-related cases, the proper measure of a plaintiff's damages in replacing supervisory goodwill with real capital is the transactional costs it incurred in raising that capital. Franklin Financial is entitled to such an award in this action, as discussed earlier in this opinion.

## RECAPITULATION

The court grants *summary judgment for plaintiffs* on part of their claim for post-breach "wounded bank" damages, including the following:

1. for *Franklin Federal,* in the amount of $109,016.83, for the aggregate payments it made in the years 1990–92 to the law firms of Muldoon, Murphy & Faucette and Miller, Hamilton, Snider & Odom, as well as to the financial consulting firm, Hiram H. Jones Associates, P.C., for capital plan preparations and regulatory advice necessitated by FIRREA;

2. for *Franklin Financial,* in the amount of $205,841.79, for the aggregate payments it made in 1993 to Investment Bank Services, Inc., to Bass, Berry & Sims, and to the OTS in connection with the public stock offering (*i.e.*, the transactional costs of raising replacement capital).

The foregoing "wounded bank" damages add up to $314,858.62. No judgment shall be entered for plaintiffs until all the claims in this action have been resolved.

The court grants *summary judgment for defendant* on the following claims:

1. the restitution claim of Franklin Financial for the $9.4 million of excess liabilities it assumed in the supervisory conversion;

2. the pre-breach reliance (or restitution) claims of Franklin Financial or, alternatively, the Seven Shareholders for

---

15. In his report Dr. Stulz also discusses a third theory of alleged damages: the cost of the Government's breach of contract to the Seven Shareholders, which he calculates at $10.6 million. This figure is composed of dilution damages ($6.6 million), future cost of capital replacement damages ($3.7 million), and future lost profits damages ($0.3 million). The dilution damages are already claimed by the Seven Shareholders (though in a slightly lower amount than the cost calculated by Dr. Stulz) as part of the plaintiffs' motion for summary judgment. Aside from their dilution damages, Dr. Stulz asserts that the Seven Shareholders also lost the additional amount UPC would have paid for Franklin Federal in the absence of FIRREA. Without the Government's breach the Seven Shareholders would have continued to own 100 % of the holding company and would have received the entire sale price of the thrift. According to Stulz, the sale price of Franklin Federal would have been increased by $3.7 million—the cost of future replacement capital, valued as of the time of the UPC transaction in 1996, rather than as of the end of 1999, and discounted at the risk-free rate to September

1996. This cost of future replacement capital is already claimed by Franklin Federal as part of its "cost of partial goodwill replacement" claim (albeit in a slightly different amount because it was discounted to a different date). In addition, Dr. Stulz asserts that Franklin Federal suffered lost profits on the portion of the thrift's supervisory goodwill—$1.04 million—that was never replaced ($6.48 million of disallowed goodwill at the time of the UPC transaction minus $5.44 million of infused capital). Stulz uses Dr. Brumbaugh's calculation of $322,000 for the thrift's lost leverage on unreplaced supervisory goodwill through 1999 (already claimed by Franklin Federal as part of its "lost profits" claim), and discounts that figure back to September 1996, resulting in future lost profits damages of $282,300. According to Stulz, the Seven Shareholders would have received this additional amount from the sale of Franklin Federal.

Thus, all of the damages discussed by Dr. Stulz as "costs to the Seven Shareholders" duplicate, or form the basis of, other claims in this action. Obviously, no double recovery can be allowed on those claims.

the $5 million infused into Franklin Federal in 1989;

3. the part of Franklin Federal's and Franklin Financial's post-breach "wounded bank" claim based on litigation expenses of $225,787.77 that were paid to the law firms of Bishop, Cook, Purcell & Reynolds, Winston & Strawn, and Muldoon, Murphy & Faucette in the years 1989–1992;

4. the claim of Franklin Federal—in the alternative amounts of $21.2 million, $14.4 million, or $12.7 million—for the hypothetical cost of replacing, or partially replacing, the thrift's supervisory goodwill with real capital.

The court finds that there are disputed issues of material fact, *precluding summary judgment for either side,* with respect to the following claims:

1. the alternative reliance damages claim of Franklin Financial based on the excess liabilities it assumed in the supervisory conversion;

2. the balance of the transactional costs claimed by Franklin Financial— $145,000 to $150,000—as post-breach "wounded bank" damages from raising new capital for the thrift in 1993;

3. Franklin Federal's claim for the increased cost of funds due to FIRREA;

4. the dilution damages claim of the Seven Shareholders;

5. the stock option claim of Charles G. Robinette;

6. Franklin Federal's claim for lost profits.

## *CONCLUSION*

As indicated at oral argument on October 23, 2002, the parties intend to proceed at trial with testimony from the witnesses previously identified and the experts whose reports are already in the record. See Transcript at 76.

The parties are directed to consult with one another, in light of the rulings issued in this opinion, and to contact the court within 30 days of the date of the opinion to recommend a course of further proceedings.

**IT IS SO ORDERED.**